**In re Adoption of C.L.G.**

**Appeal of N.P., Natural Mother.**

Superior Court of Pennsylvania.

Argued May 15, 2008.
Filed Aug. 26, 2008.

**1000**

Ira D. Binder, Oxford, for appellant.

Scot R. Withers, West Chester, Participating Party.

BEFORE: FORD ELLIOTT, P.J., MUSMANNO, LALLY–GREEN, BENDER, BOWES, PANELLA, DONOHUE, SHOGAN and ALLEN, JJ.

OPINION BY ALLEN, J.:

¶ 1 N.P. (Mother), the biological parent of C.L.G. (d.o.b. 4/14/05) appeals from the order entered on March 22, 2007, granting the petition filed by the Chester County Department of Children, Youth and Fami-

lies (Agency) and involuntarily terminating her parental rights to C.L.G.[1] Upon reconsideration, we affirm.

¶ 2 At the time of C.L.G.'s birth, both Mother and C.L.G. tested positive for cocaine. Additionally, Mother was on bail following an arrest for crimes involving drugs and child endangerment.[2] On April 18, 2005, the trial court entered an order placing C.L.G. in the protective physical and legal custody of the Agency. On April 20, 2005, the trial court adjudicated C.L.G. dependent based on a lack of proper parental care, Mother's drug issues, and a lack of adequately-equipped housing, necessary to care for a child. By order entered on May 10, 2005, the trial court granted Mother weekly supervised visits with C.L.G. Mother then began to fulfill the objectives set forth in the Agency's family service plan ("FSP"). Specifically, she participated in drug and alcohol counseling, obtained housing and employment, attended all visitations with C.L.G., and participated in Life Skills training. At this point, based on her commitment to the Agency's objectives, Mother was expected to be reunited with C.L.G.

¶ 3 Thereafter, on March 29, 2006, Mother entered an open plea of guilty to Conspiracy to Distribute Cocaine, and Endangering the Welfare of a Child, stemming from her October 3, 2004 arrest while pregnant with C.L.G. Mother was sentenced to a term of incarceration for two to five years, effective March 29, 2006.

¶ 4 On August 11, 2006, the Agency filed a petition for the termination of Mother's parental rights to C.L.G. Specifically, the Agency alleged that, pursuant to 23 Pa. C.S.A. § 2511(a)(8), the conditions which led to the removal of C.L.G. from Mother's care continued to exist for a period of more than twelve months; thus, the needs and welfare of C.L.G. necessitated termination. The trial court conducted hearings on the petition on January 3, 2007, and January 30, 2007. Thereafter, in an order entered on March 22, 2007, the trial court terminated Mother's parental rights to C.L.G.

¶ 5 On April 17, 2007, Mother filed a timely notice of appeal to this Court. On that same day, the trial court directed Mother to file a Concise Statement of Matters Complained of on Appeal, pursuant to Pa.R.A.P.1925(b). On April 27, 2007, Mother filed a timely Rule 1925(b) Statement. On appeal, Mother raises the following issues:

I. Is Termination of Parental Rights [sic] appropriate where the conditions which led to the removal or placement of a child no longer exist, but other factors prevent the child from being reunited with the parent?

II. May parental rights be terminated when the sole reason the child remains in placement and is apart from the parent is the parent's incarceration?

Mother's Brief, at 4.

¶ 6 When considering appeals such as the one presently before us, we are guided by the following:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse

1. The parental rights of M.D.G., the natural father of C.L.G., were also involuntarily terminated by the March 22, 2007 order; however, M.D.G. has not appealed from that decision.

2. On October 3, 2004, while pregnant with C.L.G., Mother was arrested in connection with a drug transaction conducted while her ten-month-old son was in a car with her. The child endangerment charge related to Mother's son, who is not involved in this appeal.

of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. *In re: Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 414 (Pa.Super.2003). We are also aware that:

In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re A.L.D.*, 797 A.2d 326, 336 (Pa.Super.2002) (quoting *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064, 1066 (1994)).

¶ 7 Moreover, an abuse of discretion occurs "when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.* Generally,

[o]ur case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. *In re D.W.*, 856 A.2d 1231, 1234 (Pa.Super.2004). Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). *In re B.L.L.,*

787 A.2d 1007, 1013–14 (Pa.Super.2001). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child. *C.M.S., supra,* [884 A.2d 1284, 1286–87 (Pa.Super.2005) ]; *A.C.H., supra,* [803 A.2d 224, 229 (Pa.Super.2002) ]; *B.L.L., supra.* Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

*In re Adoption of R.J.S.*, 901 A.2d 502, 508 (Pa.Super.2006).

¶ 8 Although Mother presents two issues on appeal, her claims dovetail; thus, we address them simultaneously. The crux of Mother's complaint on appeal is that the trial court improperly terminated her parental rights based solely on her incarceration, in contravention of our case law in *In re: B., N.M.*, 856 A.2d 847, 855 (Pa.Super.2004).

¶ 9 Specifically, Mother asserts that the uncontroverted testimony adduced at trial indicated that the issues which led to placement no longer existed. Mother emphasizes that, in compliance with the Agency's objectives, she has maintained her sobriety, attained and maintained prison employment, and conducted herself in order to attain good behavior credits and early release. Mother asserts that she did not request visitation with C.L.G. because she did not want to subject C.L.G. to a lengthy car ride. Additionally, Mother claims that, although she was unable to

fully pay her outstanding child support payments while incarcerated, she used her modest prison income to make a blanket for C.L.G. and to prepare a video for the child, in which she read C.L.G. a book.

¶ 10 With regard to Section 2511(a)(8), in order to terminate parental rights, an agency must prove by clear and convincing evidence that "(1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *R.J.S.*, 901 A.2d at 511. In conducting the three-part analysis required by Section 2511(a)(8), the trial court first concluded that, undisputedly, the child has been out of Mother's care for more than twelve months, as C.L.G. was originally removed from Mother's custody on April 18, 2005, and the Agency's termination petition was filed more than twelve months later, on August 11, 2006.

¶ 11 For the second part of the analysis required by Section 2511(a)(8), the trial court analyzed whether the conditions which led to the removal of C.L.G. from Mother's care continued to exist; namely, a lack of proper parental care, Mother's drug issues, and a lack of adequate housing equipped with the necessary items to care for a child. The trial court provided the following analysis:

We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal of the child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

Trial Court Opinion, 3/26/2007, at 10 (citations omitted) (emphasis in original). Accordingly, the trial court concluded that, although Mother exhibited substantial progress in meeting the Agency's objectives, she ultimately was unable to care for C.L.G. because, twelve months later, she could not provide the requisite parenting and adequate housing. Additionally, the trial court found Mother's testimony, wherein she vowed to adequately care for the C.L.G. upon her release from prison, lacked credibility. Trial Court Opinion, 3/26/2007, at 9. The trial court based this credibility determination on the fact that, at the time of the termination hearing, Mother would not admit that she was using cocaine during her pregnancy, despite the fact that C.L.G. was born with cocaine in her system. *Id.*

¶ 12 We find the trial court's findings and conclusions adequately supported by the record. This Court recently addressed the role of an incarcerated parent in preserving a place of importance in a child's life in *In re I.G.*, 939 A.2d 950 (Pa.Super.2007). In that case, the father of two children voluntarily placed the children in the care of the agency based on his inability to provide adequate housing and financial support. *Id.* at 951. Following the placement, the father became incarcerated on drug charges and related offenses. *Id.* at 952. Thereafter, while the father re-

mained in prison, the agency petitioned for the termination of his parental rights, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). *Id.* In addressing the effect of incarceration on a termination petition, this Court stated:

> Incarceration alone is not sufficient to support termination under any subsection. *In re C.S.,* 761 A.2d 1197, 1201 (Pa.Super.2000) *(en banc )* . . . "A parent desiring to retain parental rights must exert himself to take and maintain a place of importance in his child's life." *Adoption of Baby Boy A.* [*v. Catholic Social Servies of Diocese of Harrisburg, PA, Inc.*], 512 Pa. 517, 517 A.2d 1244, 1246 (Pa.1986) . . . . a parent's responsibilities are not tolled during incarceration, and therefore we must inquire whether the parent utilized those resources available while he or she was in prison to continue a close relationship with the child. *Adoption of Baby Boy A., supra; In re D.J.S.,* [737 A.2d 283 (Pa.Super.1999) ]; *In Interest of J.E.S.,* [365 Pa.Super. 291, 529 A.2d 514 (Pa.Super.1987) ].

*Id.* at 953. While we determined that the father maintained his relationship with his children through weekly phone calls and scheduled visitation, we find the facts in the matter sub judice necessitate a different outcome.

■ ¶ 13 In cases involving an incarcerated parent, this Court has emphasized that a "parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,N.M.,* 856 A.2d 847, 856 (Pa.Super.2004), *appeal denied,* 582 Pa. 718, 872 A.2d 1200 (2005). Moreover, "the parent wishing to reestablish [her] parental responsibilities bears the burden

of proof" relative to post-abandonment contact. *See In re K.Z.S.,* 946 A.2d 753, 759 (Pa.Super.2008)

■ ¶ 14 Instantly, C.L.G. was taken from Mother's care four days after birth. At no point in C.L.G.'s life, aside from those four days, has she been in the custody and care of Mother. Further, Mother has been incarcerated for more than half of C.L.G.'s life. At the time of the trial court's order terminating her parental rights, it had been one year since Mother had contact with C.L.G., aside from a videotape made from prison. Accordingly, this Court finds that Mother was never able to develop a parenting relationship. This failure to mold a relationship stems from the time prior to Mother's incarceration; thus, it cannot be said that her incarceration is the genesis of the issue. Our law is clear that we must inquire into the steps taken to "maintain" the parent-child relationship upon incarceration. *See In re I.G.,* 939 A.2d at 953. Here, there was no relationship to maintain, as C.L.G. tested cocaine-positive at birth, and as a consequence of Mother's drug, housing, and parenting issues, has not been cared for by Mother.

■ ¶ 15 Additionally, we conclude that Mother's incarceration for drug offenses is a direct consequence of her drug involvement; therefore, she has failed to attain the FSP goal of resolving her "drug issues." Because Mother's conviction and subsequent term of incarceration derives directly from her "drug issues," it is a part of the original reasons for the removal of C.L.G. from Mother's care and forms a basis for the termination of Mother's parental rights pursuant to Section 2511(a)(8). Moreover, Mother's resulting incarceration was a foreseeable consequence to her involvement with illegal drugs. Regardless of whether Mother used drugs in the twelve months prior to

the Agency's termination petition, the fact remains that, at the time of the termination hearing, Mother's drug related issues continued to impact C.L.G. and Mother's ability to care for C.L.G. Thus, it is the underlying drug issues which preclude Mother from properly caring for C.L.G., and not the incarceration, which is merely a consequence of Mother's inability to lead a life free from involvement with drugs.

¶ 16 In her brief, Mother alleges that the Agency can not now argue that her conviction and subsequent incarceration are encompassed by the FSP goal requiring her to resolve her drug issues because "at no time, from the initial filing of the Dependency Petition to the filing of the Petition for En Banc argument did [the Agency] attempt to make resolution of the criminal charges a condition of reunification." Mother's Brief, at 16. Contrary to Mother's assertion, the certified record contains a document submitted following the termination hearing, entitled Closing Memorandum of Chester County Department of Children, Youth and Family, wherein the Agency cites to both Mother's inability to provide housing and her "criminal issues," *i.e.*, her incarceration on drug charges, as the reasons to support termination. As noted above, we find that Mother's "criminal issues" are a direct consequence to her "drug issues" and, thus, they are synonymous for the purpose of our analysis into whether the conditions which led to C.L.G.'s removal continue to exist.

¶ 17 Further, we find this Court's jurisprudence in *In re S.H.*, 879 A.2d 802 (Pa.Super.2005), instructive to our decision. In *In re S.H.*, we affirmed the termination order pursuant to Section 2511(a)(8) based on evidence which indicated that although S.H.'s mother was making progress, she would require another one or two years before conditions would be such that the return of her child to her

custody could be contemplated. In that case, S.H. was originally removed from the mother's custody based on her drug and alcohol addiction and her mental health problems. *Id.* at 803. Following the child's placement with the agency, the mother was sentenced to two years probation on drug charges. *Id.* at 804. Upon violating her probation, the mother was then sentenced to two to four years incarceration. Thereafter, the mother's parental rights to S.H. were terminated based on Section 2511(a)(8). On appeal, S.H.'s mother argued that termination was improper because there was a reasonable possibility that she could remedy the conditions that had led to S.H.'s removal from her care. *Id.* at 806. We determined that this argument was irrelevant under Section 2511(a)(8), which requires only that the conditions continue to exist, not an evaluation of parental willingness or ability to remedy them. *Id.* We further emphasized that S.H. was eight years old at the time of termination and had spent half of her life in the custody of the agency; thus, her need for permanence and stability supported affirming termination. *Id.* at 807.

¶ 18 Here, we emphasize that we will not toll the well-being and permanency of C.L.G. indefinitely. *See In re Z.S.W.*, 946 A.2d 726, 732 (Pa.Super.2008) (a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting"). Although Mother claims that she will shortly be able to care for C.L.G. upon her release from a half-way house, Mother's promises, which the trial court has deemed lacking in credibility, do not guarantee the wellbeing of C.L.G. *Id.* The trial court, as the finder of fact, is entitled to weigh the evidence and assess its credibility. *Baehr v. Baehr*, 889 A.2d 1240, 1245 (Pa.Super.2005) (stating that the trial court, as

the finder of fact, is entitled to weigh the evidence and assess credibility).

¶ 19 Furthermore, if we were to permit Mother further opportunity to cultivate an environment where she can care for C.L.G., we would be subjecting a child, who has been waiting for more than two years for permanency, to a state of proverbial limbo in anticipation of a scenario that is speculative at best. While it appears that Mother has managed to remain drug-free in the confines of incarceration, whether she can maintain that status among the external pressures of the outside world remains to be proven. One can only speculate as to what the future conditions of Mother's release from incarceration will entail and how soon she would be permitted to have supervised visits, let alone overnight visitation or full custodial care of a child she has never parented. In fact, if Mother's life-long history of involvement with drug use and drug dealing bears upon her probability of success, she will face significant challenges in achieving a sober and productive lifestyle. More importantly, as we will discuss further *infra*, the likelihood of severe detriment to C.L.G., if she were subjected to such a precarious re-introduction to Mother, could be devastating to her developmental well-being.

¶ 20 Additionally, we find Mother's reliance on *In re C.M.E.*, 301 Pa.Super. 579, 448 A.2d 59 (1982), unavailing, as that case is factually distinguishable from the matter at hand. Mother specifically alleges that in *In re C.M.E.*, this Court held that a period of two and one-half years is, in fact, a reasonable amount of time to allow a parent to obtain the necessary parenting skills required to regain custody of a child. However, that case was decided prior to the Adoption and Safe Families Act of 1997 (ASFA), P.L. 105–89, 1997 HR 867 (November 19, 1997), 42

U.S.C. § 671–675, which imposes upon states the requirement to focus on the child's needs for permanency rather than the parent's actions and inactions. The amendments to the Juvenile Act, 42 Pa. C.S. § 6301, *et seq.*, provide that a court shall determine certain matters at the permanency hearing, including whether the child has been placed into foster care for 15 out of the last 22 months. *See* 42 Pa.C.S. § 6351(f)(9). With regard to permanency planning, the Legislature contemplated that, after reasonable efforts have been made to establish the biological relationship, the process of the Agency working with foster care institutions to terminate parental rights should be completed within eighteen months. *See In re N.W.*, 859 A.2d 501, 508 (Pa.Super.2004). As such, Mother's reliance on *In re C.M.E.* is unpersuasive. Accordingly, we find that the trial court appropriately concluded that the "conditions which led to the removal or placement of the child continue to exist;" thus, the second condition in the three-part test of Section 2511(a)(8) was met.

¶ 21 We now proceed to evaluate whether the trial court abused its discretion in concluding that the Agency proved, by clear and convincing evidence, that "termination of parental rights would best serve the needs and welfare of the child," per the third requirement of Section 2511(a)(8). We note that, initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. *See In re R.J.S.*, 901 A.2d at 508. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the

needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007). Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of C.L.G., as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

¶ 22 While Mother does not expressly challenge the trial court's determination that termination would best serve C.L.G., we find that the testimony supports this determination. Specifically, forensic psychologist Dr. Bruce E. Mapes, Ph.D., provided expert testimony regarding the nature of the relationship between Mother and C.L.G. Dr. Mapes stated that because Mother has had very little contact with C.L.G. since birth, she has been unable to engage in the kinds of repetitive, reciprocal interactions with the child necessary to instill a sense of nurturing, security, and safety. N.T., 1/30/2007, at 96. Dr. Mapes further relayed that when the child viewed the video tape of Mother reading a book, there was little response. *Id.* at 97. Dr. Mapes testified that the failure of C.L.G. to respond to the video was expected because the child did not have enough exposure to Mother to develop sensory associations between her mother and pleasant feelings. *Id.* Rather, Dr. Mapes testified that the mother-child bond has been established between C.L.G. and her foster mother, who has met all of the child's

needs since birth. *Id.* at 97–98. Dr. Mapes further stated that C.L.G. had no recollection of time spent with Mother, no daily repetitive contact, or necessary feelings of trust or safety to associate with Mother. *Id.* Moreover, Dr. Mapes opined that it would most likely be extremely harmful to remove C.L.G. from her foster mother. *Id.* at 98. Based on this testimony, we find that the trial court did not err in concluding that the needs and welfare of C.L.G. dictate termination of Mother's parental rights, as required by the third condition to Section 2511(a)(8). Further, we agree that the Agency met its burden in proving that all three requirements of Section 2511(a)(8) have been met. Accordingly, we reject Mother's claims challenging the trial court's termination of her parental rights pursuant to that section.

¶ 23 As noted *supra*, once the statutory grounds for termination have been met under Section 2511(a), the court must consider whether termination serves the needs and welfare of the child, pursuant to Section 2511(b). Relative to Section 2511(b), this Court has provided the following guidance:

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

*In re C.P.*, 901 A.2d 516 (Pa.Super.2006). Moreover,

> The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. *In re Adoption of K.J.*, [936 A.2d 1128, 1134 (Pa.Super.2007) ]. ... The court must consider whether a natural parental

bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.,* [761 A.2d 1197 (Pa.Super.2000) ]. Most importantly, adequate consideration must be given to the needs and welfare of the child. *In re J.D.W.M.,* 810 A.2d 688, 690 (Pa.Super.2002).

*In re K.Z.S.,* 946 A.2d at 760.

¶ 24 Although Mother does not challenge the trial court's analysis of Section 2511(b), we proceed to address this issue nonetheless. In addressing the best interest of C.L.G., the trial court emphasized mother's inability to meet the parental duties required for the well-being of the child:

> The parents in this matter have a duty, like all parents, to ensure their child's wellbeing in a stable environment where there is a safe, healthy home and where a parent can and does put the child's needs paramount to his or her own. The parents herein have demonstrated that they cannot bear this responsibility. We find that the needs and welfare of C.L.G. will be best promoted by terminating the parental rights of Father, M.D.G., and Mother, N.L.P.

Trial Court Opinion, 6/26/07, at 13.

¶ 25 The trial court additionally evaluated the bond between Mother and C.L.G. and concluded that there was "no indication that an emotional bond exists to the extent that the termination of parental rights of Mother would be emotionally detrimental to C.L.G." *Id.* at 12. In reaching this conclusion, the trial court again credited the testimony of Dr. Mapes. *Id.* Dr. Mapes testified that there was an "extremely limited bond" between Mother and C.L.G. because of the lack of "repetitiveness" in their relationship. N.T., 1/30/2007, at 96. As a result, Dr. Mapes stated that C.L.G. is unlikely to experience the same sense of safety and security that she feels in foster mother's care. Dr. Mapes further concluded that visitation with Mother, at this point, would be tantamount to C.L.G. visiting with a stranger. *Id.* Accordingly, Dr. Mapes expressed "serious reservations" as to whether C.L.G. could adjust from living with her foster parents, the only parents she has ever known. Dr. Mapes further opined that if C.L.G. were removed from her foster home, "it's very likely to be extremely harmful to her." *Id.* at 98. Dr. Mapes recognized that upon release from incarceration, Mother will face various factors that may affect her ability to parent C.L.G.:

> I really don't know what baggage the mother is going to have that she is going to have to deal with, because I'm quite sure that things are going to come up, you know, if she goes through any type of a treatment process, and there [sic] issues are going to come up that will need to be addressed.
>
> She is going to have a lot to address just trying to continue to get her own life together, so that she can maintain something. So, I mean, there's a lot of factors that can come into play. So when we say four months from now, five months from now, I mean, it could be two, three years before she could actually be in a position to seriously consider being able to care for her child.

N.T., 1/30/07, at 102–103.

¶ 26 Based on expert testimony of Dr. Mapes, as supported by the record, we find that the trial court properly concluded that, due to the lack of a bond between Mother and C.L.G., and, conversely, the existence of a strong bond between C.L.G. and her foster mother, termination serves the needs and welfare of the child. Moreover, severance of the parental bond with her foster mother could have a devastating

emotional impact of C.L.G. Accordingly, termination of Mother's parental rights best serves the needs and welfare of C.L.G., under Section 2511(b), by providing her with the permanence necessary for "the fulfillment of her potential in a permanent, healthy and safe environment." *In Interest of Lilley,* 719 A.2d 327, 335 (Pa.Super.1998). For the reasons discussed herein, we affirm the order the trial court terminating Mother's parental rights to C.L.G.

¶ 27 Order affirmed.

¶ 28 FORD ELLIOTT, P.J., and MUSMANNO, LALLY–GREEN and PANELLA, JJ., join the Majority Opinion.

¶ 29 Judge BENDER files a Dissenting Opinion in which BOWES, DONOHUE and SHOGAN, JJ. join.

## DISSENTING OPINION BY BENDER, J.:

¶ 1 Because I believe that the conditions that existed at the time of C.L.G.'s removal were remedied and are not the same as the only condition that presently exists, I would reverse the order granting the termination of Mother's parental rights.

¶ 2 The facts of this case present a situation not representative of most termination cases that reach this Court in that so often parents do not comply with the requirements set by the trial court that if met would result in reunification. Here, the conditions that the agency initially had concerns about were drug and alcohol use, lack of appropriate housing and baby items, and no employment. With regard to these conditions/concerns, the court stated that:

> Mother's conduct between April 18, 2005 and March 29, 2006 is commendable. **Mother complied with every requirement directed by the Dependency Court.** She established an independent home, obtained employment, attended Drug and Alcohol programs and attended every scheduled visit with the child. Mother was clearly working toward the goal of reunification with the child. Testimony from the C.Y.F. caseworker indicated that had Mother not been incarcerated in March 2006, she was on track for reunification with the child.

Trial Court Adjudication, 3/22/07, at 9 (emphasis added). The court also noted that a sentence of probation was expected after Mother pled guilty to the charges that arose from the single incident when she transported a friend who was part of an illegal drug operation. The Majority's characterization that Mother has had a life-long drug habit is not supported by the record. In any case, Mother was given a sentence of two to five years' incarceration. But, even from prison, Mother maintained contact with C.L.G. to the extent she could by writing letters, sending cards, and making a blanket and a book on video.

¶ 3 What is most noteworthy about this case was the testimony provided by Valerie Capobianco, the agency's case worker, by Monica Warmijak, the agency's reunification worker, and Barbara Thompson, a therapist with NHS Human Services of Chester County. Ms. Capobianco testified about Mother's initial issues and how they were resolved by Mother either on her own or in connection with aid from the agency, noting that Mother obtained housing and employment and was consistent with drug and alcohol treatment. She also explained that Mother was beginning unsupervised visits that would have progressed to overnights, but was interrupted when Mother was incarcerated.

¶ 4 With regard to Ms. Warmijak, who testified at Mother's sentencing hearing on March 29, 2006, she indicated that she began working with Mother in mid-November of 2005. As part of Ms. Warmi-

jak's testimony, she read a letter that she had written on Mother's behalf.

> [Mother] has been extremely cooperative and has complied with every request asked of her. She has maintained employment, as well as stable housing for her and her son. Visits with her daughter have increased to unsupervised and will continue dependent upon the outcome of her sentencing. However, the Court should know that, at this time, Chester County Department of Children, Youth and Families has been in an indeterminate state and is reluctant to return custody of her daughter due to the circumstances surrounding [Mother's] legal situation and the uncertainty of the outcome of her sentencing. Under normal circumstances, [Mother's] child would have been returned to her physical custody, since she has proved to this agency that she is drug free and has adequately provided her children with the necessary care and supervision to assure their safety and well-being. **[Mother] has been successful in meeting all of her goals.**

N.T. Sentencing Hearing, 3/29/06, at 29 (emphasis added).[3]

¶ 5 Likewise, Ms. Thompson's testimony at Mother's sentencing hearing indicated that Mother had cooperated and complied with all agency requirements, had undergone weekly therapy, drug screenings, and attended two types of group therapy in addition to her individual therapy. Ms. Thompson acknowledged that Mother had been drug and alcohol free since beginning treatment in May of 2005 without any relapses, has continued to make steady progress, has continued treatment, and

was working full time. Ms. Thompson further reported that mainly based on Mother's interaction with her son,[4] she believes Mother to be an excellent parent.

¶ 6 The essential core of Mother's argument is that based upon the evidence presented by the Agency, the conditions which led to C.L.G.'s removal from Mother's care no longer exist and incarceration alone does not provide a basis for termination of parental rights. The agency's own witnesses all agreed that Mother, **before** her incarceration, had successfully completed everything required of her, including maintaining a drug-free status, and that reunification was on the horizon. She was not drug-free due to her incarceration as described by the Majority. Moreover, Mother has continued to do all she can while in prison so that she will be available as soon as possible for reunification. However, now the lower court and this Court's Majority equate Mother's incarceration with the conditions that led to C.L.G.'s removal in the first instance.

¶ 7 I disagree with this assessment, noting particularly that to meet the burden of proof under 23 Pa.C.S. § 2511(a)(8), the Agency must prove all three elements listed in that subsection. See *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa.Super.2006) (stating "(1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child"). Obviously, more than twelve months have elapsed since C.L.G. was re-

---

**3.** The transcript from Mother's sentencing hearing was submitted into evidence at the termination hearing by the agency.

**4.** The son referred to by Ms. Thompson and Ms. Warmijak was the ten-month old child in

Mother's car at the time of her arrest. Interestingly, this child was never deemed to be at risk by the agency and apparently remained in Mother's care.

moved from Mother's care. And pursuant to the court's reliance on Dr. Mapes' testimony, it is apparent that evidence exists in the record that can support the third element regarding C.L.G.'s needs and welfare. In this regard however, the Majority's extensive discussion of the testimony provided by Dr. Mapes, whose opinion was sought by the trial court and who gave his opinion based solely on his review of the agency's case file, essentially as a hypothetical situation, is not founded upon actual interaction with the parties involved. Dr. Mapes never interviewed Mother, the child or the foster parents. This in my mind is quite troubling when so much of Dr. Mapes' testimony is relied upon and in some ways is not consistent with testimony provided by agency personnel, who did interact with the parties.

¶ 8 With regard to element (2) of the test, I would conclude that the conditions that existed at the time of C.L.G.'s removal were remedied and are not the same as the only condition that presently exists, *i.e.*, Mother's incarceration.[5] Moreover, the Majority's statement that it "find[s] that Mother's 'criminal issues' are a direct consequence to her 'drug issues' and ... are synonymous for the purpose of our analysis into whether the conditions which led to C.L.G.'s removal continue to exist" is not supported by any case law that I can locate. Also, as for the Majority's reliance on *In re S.H.*, 879 A.2d 802 (Pa.Super.2005), that case is clearly distinguishable in that in *In re S.H.* the mother had a long history of drug and alcohol abuse in addition to prior imprisonment on drug charges. Here, this was Mother's first involvement with the criminal justice system and unlike the mother in *In re S.H.*,

Mother here fully complied with all directives from the agency. The mother in *In re S.H.* did not and additionally violated her probation, which resulted in her reincarceration.

¶ 9 This Court has often reiterated that: Where a parent is incarcerated, **the fact of incarceration does not, in itself, provide grounds for the termination of parental rights.** However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super.2004) (citations omitted and emphasis added). Again, Mother has been doing all she can under the circumstances that exist while she is incarcerated. The Majority's position appears to equate Mother's incarceration with grounds for termination, regardless of what attempts Mother has made to foster the relationship with child while in prison and the Majority certainly overlooks what Mother accomplished prior to her incarceration.

¶ 10 Lastly, it is apparent that the Majority recognizes the bifurcated approach that courts are to undertake when engaged in a review of termination proceeding.

The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). **Only after determining that the parent's conduct warrants termination of his or her**

---

5. Mother's minimum sentence of two years was scheduled to elapse in March of 2008. In Mother's brief, she notes that, although not of record, since the termination hearing and

decision, she has earned early release and is living in a half-way house in Philadelphia. She is employed and continues her sobriety.

parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute.

*R.J.S.*, 901 A.2d at 508 (emphasis added).[6] Nevertheless, the Majority overlooks the lack of support in the record pertaining to the first hurdle, i.e., that the parent's conduct warrants termination.

¶ 11 Because I would conclude that the agency failed to prove, as a threshold matter, that Mother's conduct warranted termination, namely, that the conditions that existed at the time of C.L.G.'s removal were remedied and that her incarceration was not a condition that existed at the time of removal, I would reverse the trial court's order terminating Mother's parental rights.

¶ 12 Accordingly, I respectfully dissent.

**6.** We do not disagree with the Majority that consideration of the needs and welfare of the child is mandated by section 2511(b) in all termination cases even when not challenged on appeal to this Court. However, in this case the elements of section 2511(a)(8) must also be met.