J-S15002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 136 WDA 2021 |

Appeal from the Order Entered January 11, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000199-2019

BEFORE:   LAZARUS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED: AUGUST 9, 2021**

T.B. (Father) appeals from the trial court's order involuntarily terminating his parental rights to his minor son, I.B. (Child) (born 10/2017). After careful review, we affirm.

Child was placed in Father's care by the Allegheny County Office of Children, Youth and Families (CYF), after being released from the hospital following his birth in October of 2017.  A.C. (Mother)[1] had given birth to Child

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mother has also filed an appeal from the court's order terminating her parental rights to Child. Mother's appeal is docketed at 183 WDA 2021. Because the factual circumstances underlying termination were different in each case, we have not consolidated the appeals.

while she was incarcerated[2] for theft at Allegheny County Jail. In November of 2017, CYF received three reports regarding Father; for each incident, CYF reported to Father's home and addressed each of the allegations with him. N.T. Termination Hearing, 12/18/20, at 14. The third report involved a deceased man being discovered in Father's home, when neither Father nor Child were present. Father reported to CYF that the decedent was a friend who had fatally overdosed on drugs in his home. *Id.* at 15. As a result of that incident, CYF implemented crisis in-home services to offset removal of Child from Father's care. *Id.*

On December 15, 2017, Child was removed from Father's home after police executed a search warrant at the residence and found people in Father's home under the influence of heroin with Child present and recovered several stamp bags of heroin from the home. *Id.* at 15-16, 80. Father was arrested and, after being read his *Miranda*[3] rights, told the police "[he] quit selling two weeks ago." *Id.* at 80-81. In January of 2018, Father was ordered to undergo a drug and alcohol evaluation and comply with random urine screens. Order, 1/16/18. On March 29, 2018, Father was arrested again after police discovered heroin and cocaine in a vehicle in which Father was a passenger.

_____

[2] Upon her release from prison, Mother was scheduled to be discharged to a 90-day inpatient drug treatment program where she was not permitted to have custody of Child. *See* N.T. Termination Hearing, 10/23/20, at 12.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

N.T. Termination Hearing, 12/18/20, at 80-82.[4]  An additional eight bundles of heroin were recovered from a subsequent search of Father's residence.  *Id.* at 83-84.  On July 10, 2018, Father pled guilty to one count of possession of a controlled substance,[5] resulting from the 2017 raid on his home, and one count of possession with intent to deliver a controlled substance,[6] as a result of his 2018 arrest.  In August of 2018, the court ordered Father to secure stable, safe housing and limited his visits with Child to unsupervised, community visits.  Order, 8/9/18.

From the time of Child's removal, CYF had concerns regarding Father's association with drugs and drug users in his home.  N.T. Termination Hearing, 12/18/20, at 46.  Father was not permitted to have unsupervised visits with Child in his home due to ongoing concerns that he was allowing people to use drugs there.  *Id.* at 73.  Mother reported to Neil Rosenblum, Ph.D., a psychiatric expert, that she had overdosed in Father's home in November of 2018.  *See* Report of Neil Rosenblum, Ph.D., 2/28/19, at 3.  The court's continued concern about Father's drug involvement was also based upon the observations by Father's CYF visit supervisor, Kristina Scott, and his Project STAR parenting coach, Coach Kirk Thoma.  During one visit, Coach Thoma observed Father answer his phone and tell the caller, "I'll get the money to

_____

[4] Ten bundles of heroin were recovered from the driver.  A Ziploc bag of crack cocaine and $591.00 were found on Father's person.  *Id.* at 83.

[5] 35 P.S. § 780-113(a)(1).

[6] 35 P.S. § 780-113(a)(30).

you after my visit with my son." N.T. Termination Hearing, 10/23/20, at 127-29. During coached parenting sessions, Father would frequently talk to Coach Thoma about money. One conversation included discussing an Audi that Father had recently purchased in cash. *Id.* at 130 (Q: "[I]f we're talking about just [F]ather talking about money, [F]ather recently purchased a ca[;] It's an Audi and he told me what he had paid for it in cash. Q. And what did [F]ather admit to you? A: For the car he paid $24,000 in cash."). Coach Thoma also testified that Father told him "numerous times" that he "traded taking drugs and he became addicted more to the money of selling drugs[.]" *Id.* at 131. Father also mentioned to Dr. Rosenblum that he enjoyed the "financial gains" of selling drugs. *Id.* at 55.

Both Coach Thoma and Ms. Scott were concerned about the frequent visitors to Father's home and the numerous phone calls Father would receive during visits and coaching sessions. Ms. Scott reported that Father received as many as twenty phone calls during his visits with Child and that between August of 2018 and April of 2019, there were approximately eighteen incidents of people knocking on Father's door during a visit. *Id.* at 91-92. When Father did not answer the door, these individuals "would go around the back of the home and knock on the window." *Id.* at 91.

Although the number of visitors to Father's home decreased after he moved to a new neighborhood in May of 2019, Father continued to receive concerning phone calls and visitors during supervised visits with Child and his parent coaching sessions. N.T. Termination Hearing, 12/18/20, at 92.

Between May of 2019 and October of 2020, approximately one dozen visitors came to Father's new residence during parent coaching sessions. *Id.*, 10/23/20, at 124. According to Coach Thoma, at least two individuals appeared regularly at Father's new home: a "younger" man, who began visiting in early July of 2019, and an "underweight and very pale" woman, who "didn't have a very healthy overall look about her." *Id.* at 124-27. In one instance, which Coach Thoma found "kind of weird," this woman interrupted a parent coaching session, ostensibly to use Father's phone. *Id.* During a home assessment on August 7, 2019, a CYF caseworker observed a "very thin" woman sitting on Father's bed who was "significantly younger than him[,] which is the dynamic between him and [Child's] mom." *Id.*, 12/18/20, at 70. When the caseworker expressed her concerns to Father, he said the woman was "just a friend." *Id.*

Father also continued to receive an inordinate number of phone calls during visits after moving to his new residence. Coach Thoma testified that generally, during sessions with Father:

> There were countless, countless phone calls. Father would usually say they're robo[t] phone calls, but not always, and there were times when he did answer and would get mad at the person or persons because he would explain to them that he was in the middle of a visit and that he could talk to them afterwards, but there were many, many phone calls throughout all the visits.

*Id.* at 127.

On November 9, 2019, CYF filed a petition to involuntarily terminate Father's parental rights to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5),

(8), and (b). Termination hearings took place on October 23, 2020, and December 18, 2020. At the second termination hearing, Father denied selling drugs or using drug money to purchase the Audi. N.T. Termination Hearing, 12/18/20, at 136-37. When asked how he was able to afford the car, Father said that "[he] started saving . . . [his] Social Security, [his] unemployment [compensation], and [his salary from his] job, . . . because [he] didn't want to catch the bus anymore." *Id.* at 137-38. Father admitted that "[he knew] the people who sell the drugs . . . [and] used to get drugs and give it to them," *id.* at 136, but that now he sold drugs to his friends because "they were in sickness. They were so sick. They begged." *Id.* at 147. Father acknowledged having a criminal history of selling drugs, but testified that he stopped because it was "causing [him] too [many] problems."[7] *Id.* at 147. When asked about the frequent visitors to his home, Father testified on cross-examination as follows:

_____

[7] Father explained:

> [W]hen I used to sell drugs in 2005, I went to jail. I used to sell crack. The police told me, he said, ["]man["], he said, ["]you are one of the nicest dope dealers I ever met[,"] but I got out of it . . . and then all of a sudden this heroin came out[.] . . . I used to get heroin for people who I knew but I don't do that no more because it is causing me too [many] problems. Just like the officer said that when I got arrested [in March of 2018], ["W]here [did] this crack came from[?"] I don't know because I just caught a ride, you know. In my opinion, I think the cop was lying because nobody in that apartment had no crack. Nobody smokes crack. I don't.

*Id.* at 147.

Child's counsel:    Just so we're clear, you're saying that you were never selling drugs, you were buying drugs and giving them –

Father:        They would give me the money but I know the people that I was dealing with, okay.

Child's counsel:    So then you had people coming to your home that were looking for drugs and wanted you to buy them drugs, right?

Father:        Sometimes, yes, ma'am.

Child's counsel:    Okay.

Father:        Sometimes they came and asked me but I didn't do it.

Child's counsel:    Do you understand why that was a concern for CYF and a concern for the [c]ourt?

Father:        Yes, that's why I quit all of that, yes.

*Id.* at 146.

During his psychological evaluations with Dr. Rosenblum, Father acknowledged that throughout 2018, he would periodically obtain drugs for friends because he has a hard time saying no to people. N.T. Termination Hearing, 10/23/20, at 55. Father "fully admitted each and every time" he met with Dr. Rosenblum that "[Father i]s too nice of a guy, that he has a hard time turning people down, and of course particularly in regard to . . . [M]other." *Id.* at 56. As recently as September of 2020, Father told Dr. Rosenblum that he gave Mother money when she asked, although he insisted she was not using the money for drugs. Report of Neil Rosenblum, Ph.D., 10/9/20, at 8.

On December 18, 2020, the trial court entered an order terminating Father's parental rights pursuant to sections 2511(a)(2), (5), (8), and (b) of

- 7 -

the Adoption Act.[8]  Father filed a timely notice of appeal and court-ordered

Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Father presents the following issues for our review:

> (1)  Whether the [t]rial [c]ourt erred and/or abused its discretion in finding [CYF] met [its] burden of proof and proved by clear and convincing evidence that [Father's] parental rights should be terminated pursuant to 23 Pa.C.S.A. §[§] 2511(a)(2), (a)(5), and (a)(8).
>
> (2)  Whether the [t]rial [c]ourt erred and/or abused its discretion in finding [CYF] met [its] burden of proof and proved by clear and convincing evidence that terminating [Father's] parental rights best meets [Child's] needs and welfare pursuant to 23 Pa.C.S.A. § 2511(b).

Father's Brief, at 5.

We review the trial court's decision to involuntarily terminate parental

rights for an abuse of discretion or error of law.  *In re A.R.*, 837 A.2d 560,

563 (Pa. Super. 2003).  Our standard of review is well-settled:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks

omitted).

_____

[8] 23 Pa.C.S.A. §§ 2101-2938.

- 8 -

Under section 2511 of the Adoption Act,[9] termination of parental rights requires a bifurcated analysis that initially focuses on "the conduct of the parent and whether the party seeking termination has proven by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). The party seeking termination of parental rights bears the burden of proving by clear and convincing evidence that at least one of eight grounds for termination under section 2511(a) exists, and that termination promotes the emotional needs and welfare of the child as set forth in section 2511(b). *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re A.L.D.*, 797 A.2d 326, 336 (Pa. Super. 2002).

In his first issue on appeal, Father contends that the trial court erred in concluding that CYF met its burden of proving, by clear and convincing evidence, that his parental rights should be terminated under sections 2511(a)(2), (5), and (8). Specifically, Father claims that termination is improper where he has complied with his court-ordered goals to remedy the conditions that led to Child's removal, CYF failed to provide necessary services

---

[9] 23 Pa.C.S.A. § 2511.

to reunify him with Child, and termination would not best serve Child's needs and welfare. Father's Brief, at 19.

After reviewing the record, we conclude that the trial court properly found "clear, direct, weighty, and convincing" evidence supporting termination of Father's parental rights exist pursuant to 23 Pa.C.S.A. § 2511(a)(8).[10] **See id.**; **In re A.L.D.**, **supra**.

To terminate parental rights pursuant to section 2511(a)(8), a petitioner must prove, by clear and convincing evidence, that:

> [(1)] The child has been removed from the care of the parent by the court[; (2) twelve] months or more have elapsed from the date of removal[; (3)] the conditions which led to the removal [] of the child continue to exist[;] and [(4)] termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8). "[T]ermination under subsection (a)(8) 'does not require an evaluation of [the parent's] willingness or ability to remedy the conditions that led to placement of the children.' Instead, subsection (a)(8) 'requires only that the conditions continue to exist' after the twelve[-]month period has elapsed." **In re Adoption of R.K.Y.**, 72 A.3d 669, 679–80 (Pa. Super. 2013) (internal citations omitted).

---

[10] While the trial court also found grounds for termination under subsections 2511(a)(2) and (5), we may affirm the trial court's decision regarding the termination of parental rights with regard to any singular subsection of section 2511(a). **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

The first two prongs of section 2511(a)(8) was clearly satisfied here, as Child had been removed from Father's care, by the court, for almost three years at the time of the termination hearings.[11]  While application of subsection (a)(8) "may seem harsh" when a parent has demonstrated progress in remedying the conditions, "the statute implicitly recognizes that a child's life cannot be held in abeyance" and the statutory and case law "contemplates only a short period of time . . . in which to complete the process of either reunification or adoption."  *In re J.F.M.*, 71 A.3d 989, 997 (Pa. Super. 2013) (citation omitted).  *See In re C.L.G.*, 956 A.2d 999, 1005 (Pa. Super. 2008) (en banc) ("[A]lthough Mother exhibited substantial progress in meeting the Agency's objectives, she ultimately was unable to care for [her child] because, twelve months later, she could not provide the requisite parenting and adequate housing.").

---

[11] Here, Child was removed from Father on December 15, 2017.  Father's contention that a period of two to two and a half years can be a "reasonable period of time" to remedy conditions, Father's Brief, at 16, is only applicable to section 2511(a)(5), not section 2511(a)(8).  *See* 23 Pa.C.S.A. § 2511(a)(5) (termination of parental rights proper where petitioner proves, by clear and convincing evidence, that "[t]he child has been removed from the care of the parent by the court . . . for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions **within a reasonable period of time**, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child **within a reasonable period of time** and termination of the parental rights would best serve the needs and welfare of the child") (emphasis added); *see also In re Adoption of R.K.Y*, *supra*.

With regard to the third prong of section 2511(a)(8)—the conditions that led to Child's initial removal—the record bears out the fact that Father's lifestyle and association with drug sales and drug users continue to exist. This Court has concluded that termination is proper under subsection (a)(8) where "at the time of the termination hearing, [the parent's] drug[-]related issues continued to impact [the child] and [the parent's] ability to care for [the child]." *In re C.L.G.*, 956 A.2d 999, 1006–07 (Pa. Super. 2008) (en banc).[12] Specifically, "[a] child cannot be returned to a home in which drug activity is occurring," especially when drug activity is among the conditions that led to the initial removal, regardless of whether a parent continued to engage in personal drug use.[13] *Id.*; *In re Adoption of M.A.R.*, 591 A.2d 1133, 1137 (Pa. Super. 1991) (father's drug convictions and fact that he frequented mother's home relevant evidence to assess mother's home environment for purposes of termination analysis).

_____

[12] In *In re C.L.G.*, this Court stated:

> Regardless of whether [m]other used drugs in the twelve months prior to the Agency's termination, the fact remains that, at the time of the termination hearing, [m]other's drug[-]related issues continued to impact [child] and [m]other's ability to care for [child]. Thus, it is the underlying drug issues [that] preclude [m]other from properly caring for [child] and not the incarceration, which is merely a consequence of [m]other's **inability to lead a life free from involvement with drugs**.

*Id.* at 1006–07 (emphasis added).

[13] There is no evidence of record to suggest that Father has used drugs since Child's birth.

Instantly, Child was initially removed from Father's care in December of 2017 after police discovered heroin and active drug use in Father's home in the presence of Child. Mother also overdosed in Father's home eleven months after Child's removal. Father has never progressed to unsupervised visitation with Child in his home due to the number of suspicious visitors and phone calls Father would receive during supervised visits. These visitors and phone calls continued after Father moved to a new home in May of 2019. In March of 2018, Father was arrested and subsequently pled guilty to drug-related charges. Father has been the target of multiple search warrants, before and after Child's removal, resulting in heroin being recovered from his residence. Most significantly, Father has acknowledged he has trouble saying "no" when people ask him to buy drugs for them or when Mother asks him for money. Father has also admitted to enjoying the money he made selling drugs.

Although Father may genuinely love his son and has demonstrated moderate compliance with his court-ordered plan, Father has been unable to lead a life free from involvement with drugs in the three years since Child was removed from his care. Thus, a significant safety concern for Child continues to exist, which satisfies the third prong under section 2511(a)(8). *In re D.A.T.*, 91 A.3d 197, 205-06 (Pa. Super. 2014) ("[T]his Court has held that, where a parent has addressed some of the conditions that led to a child's removal, but other conditions still exist, [the third prong of section 2511(a)(8)] may be deemed to be satisfied."). *Cf. In re R.A.M.N.*, 230 A.3d 423, 428-29 (Pa. Super. 2020) (termination petition denied where no factual

- 13 -

basis to conclude conditions warranting children's initial removal continued to exist; agency failed to present evidence demonstrating parent will fail to protect children).

With regard to the fourth prong of section 2511(a)(8), that termination would best serve the child's needs and welfare, this Court has explained:

> [W]hile both [s]ection 2511(a)(8) and [s]ection 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to [s]ection 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by [s]ection 2511(b); as such, they are distinct in that we must address [s]ection 2511(a) before reaching [s]ection 2511(b).

*In re C.L.G.*, *supra* at 1009. "[T]he analysis under [s]ection 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent." *Id.* at 1008-09.

Instantly, the trial court did not specifically conduct a needs and welfare analysis under section 2511(a)(8), but, did address Child's needs and welfare generally under a best interest analysis. In its best interest analysis, the court determined that "Father's lifestyle would undoubtably create an unsafe and unstable environment for [Child] . . . [and] Father's poor judgment in general, as well as with regard to Mother[,] would most certainly subject the child to danger and disruption." Trial Court Opinion, 2/25/21, at 25-26.[14] Relying on

_____

[14] "In Dr. Rosenblum's final evaluation, he concluded that 'it remains difficult to view [Father] as capable of providing [Child] with a supportive home environment or guiding his development in [a] secure direction.'" *Id.* at 25 (quoting Report of Neil Rosenblum, Ph.D., 10/9/20, at 11).

the expert opinion of Dr. Rosenblum, the court also determined that "removing [Child] from his current placement could have long[-]lasting harmful effects on him."[15]  *Id.* at 28.  Because the trial court's best interest analysis considered Father's behavior, as well as Child's need for safety and stability, we find the trial court did not err in concluding that the needs and welfare of Child support termination of Father's parental rights pursuant to the third prong of section 2511(a)(8).  **See In re C.L.G.**, *supra* at 1009 (expert opinion regarding parent's inability to meet needs and welfare and harm of removing child from current placement satisfied fourth prong of section 2511(a)(8)). Thus, we conclude that CYF met its burden in proving, by clear and convincing evidence, termination was warranted under section 2511(a)(8).  **See In re L.M.**, *supra*.

Having concluded that termination was proper under subsection (a)(8), we may now move on to subsection 2511(b) – "other considerations," – which includes a needs and welfare analysis.  Pursuant to section 2511(b), "[t]he court[,] in terminating the rights of a parent[,] shall give primary consideration to the developmental, physical[,] and emotional needs and

---

[15] **See** Report of Neil Rosenblum, Ph.D., 10/9/20, at 11 ("[Child] remains a very sensitive and[,] at times[,] emotionally insecure youngster who does not adjust well to change.  As such it would be highly disruptive to [Child's] attachment process and emotional[] well[-]being to remove him from [his current placement.]").

welfare of the child." 23 Pa.C.S.A. § 2511(b).[16] The section 2511(b) needs and welfare analysis is determined under the standard of best interests of the child. ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." ***Id.***

Father argues that preservation of natural family bonds should be favored over severing the bond between Father and Child forever. Father's Brief, at 22 (citing ***Santosky v. Kramer***, 455 U.S. 745, 767 (1982)).

We note that section 2511(b) "does not explicitly require a bonding analysis." ***In re Adoption of C.D.R.***, 11 A.3d 1212, 1219 (Pa. Super. 2015) (internal citations omitted). Rather, the bond between a parent and child is "only one of many factors to be considered by the court when determining what is in the best interests of the child." ***Id.*** In considering a child's needs and welfare under section 2511(b), "[t]he court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." ***In re M.P.***, 204 A.3d 976, 984 (Pa. Super. 2019) (internal citation omitted).

Here, the trial court relied on the testimony of Dr. Rosenblum to conclude that severing any existing bond between Father and Child would not

---

[16] Likewise, "[w]ith respect to any petition filed pursuant to subsection[s] (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition" 23 Pa.C.S.A. § 2511(b).

cause Child to suffer any detrimental effects. Doctor Rosenblum opined that "[although Child] knows his parents[,] he does not have a primary attachment to either [M]other or [F]ather." Report of Neil Rosenblum, Ph.D., 10/9/20, at 11. Moreover, Dr. Rosenblum concluded that Child has developed an increasingly secure attachment with his foster parents and thrives in their care. *Id.* In fact, in Dr. Rosenblum's opinion, removing Child from his foster home would put Child at risk of developing a serious attachment disorder. *Id.* Accordingly, Dr. Rosenblum concluded that adoption is the only permanency outcome consistent with Child's needs and welfare.[17] *Id.* In light of this, we conclude that the trial court properly determined that termination would serve Child's needs and welfare under section 2511(b) where Father is not capable of providing the safety and security Child needs and where Child's need for permanency weighs heavily. *In re M.P.*, *supra*.

Thus, we conclude that the trial court's factual findings are supported in the record and that the trial court neither abused its discretion nor committed

_____

[17] We note that Foster Mother told Coach Thoma that "if [Child] doesn't go with [F]ather, meaning that if [Child] is adopted, . . . [Father] will have so many visits with [Child] that [Father] will get sick of him." N.T. Termination Hearing, 10/23/20, at 133-43. Perhaps the best option for Father at this juncture is to seek a mutual agreement with foster parents to permit him to visit with Child if and when he is adopted by foster parents. *See* 23 Pa.C.S.A. § 2731 (provides option for adoptive parents and birth relatives to enter into voluntary agreement for ongoing communication or contact that: "(1) is in the best interest of the child; (2) recognizes the parties' interests and desires for ongoing communication or contact; (3) is appropriate given the role of the parties in the child's life; and (4) is subject to approval by the courts").

an error of law in terminating Father's parental rights under sections 2511(a)(8) and (b). *In re T.S.M.*, *supra*.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/09/2021