J-S58044-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: E.A., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.A., NATURAL MOTHER | : | No. 877 WDA 2014 |

Appeal from the Order Dated May 5, 2014
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): TPR 173 of 2013

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., AND PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:　　　　　　**FILED SEPTEMBER 15, 2014**

Appellant, E.A. ("Mother"), appeals from the order entered in the Allegheny County Court of Common Pleas, which involuntarily terminated her parental rights to her minor child, E.A. ("Child").  We affirm.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Mother raises one issue for our review:

> DID THE TRIAL COURT ABUSE ITS DISCRETION AND/OR ERR AS A MATTER OF LAW IN CONCLUDING THAT TERMINATION OF [MOTHER'S] PARENTAL RIGHTS WOULD SERVE THE NEEDS AND WELFARE OF CHILD PURSUANT TO 23 PA.C.S.A. § 2511(B)?

(Mother's Brief at 5).

The standard and scope of review applicable in termination of parental rights cases are as follows:

_____

*Retired Senior Judge assigned to the Superior Court.

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We may uphold a termination decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result.

*In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008) (internal citations omitted). *See also In re Adoption of C.L.G.*, 956 A.2d 999, 1003-04 (Pa.Super. 2008) (*en banc*).

After a thorough review of the record, the briefs of the parties, the applicable law, and the comprehensive opinion of the Honorable Alexander P. Bicket, we conclude Mother's issue merits no relief. The trial court opinion

- 2 -

discusses and properly disposes of the question presented. (**See** Trial Court Opinion, filed June 27, 2014, at 4-12) (finding: Mother challenges only court's determination under Section 2511(b);[1] Child has special needs and significant developmental delays due to brain injuries and will require significant care and attention in future; Dr. Patricia Pepe indicated that Mother has been unable to meet expectations for parenting and did not exhibit individual stability to parent; CYF caseworker Jaime Greenberg testified Mother failed to complete Family Service Plan ("FSP") goals, including addressing Mother's mental health and substance abuse issues which continue to exist; Mother's contact with Child has been inconsistent since Child's placement; Child's foster parents understand Child's special needs, and Child has made progress in their care; Child is bonded to foster parents and calls them "mommy" and "daddy"; foster parents exhibit excellent parenting skills and are willing to adopt Child; court found testimony of Dr. Pepe and CYF caseworker credible; termination of Mother's parental rights best serves Child's needs and welfare; CYF met its burden for involuntary termination of Mother's parental rights by clear and convincing evidence).[2] Accordingly, we affirm on the basis of the trial court's opinion.

Order affirmed.

---

[1] Mother concedes on appeal that the Allegheny County Office of Children, Youth and Families ("CYF") met its burden under Section 2511(a)(2). **See** Mother's Brief at 9.

[2] The correct citation for **In re S.D.T., Jr.** is 934 A.2d 703 (Pa.Super. 2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2014

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**
**FAMILY DIVISION**

IN RE: E.A., a Minor Child

APPEAL OF: E.A., Natural Mother

FILED
2014 JUN 27 PM 1:44
DEPT OF COURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

**Children's Fast Track Appeal**

Docket No.: JV-11-831
TPR No. 173 of 2013
877 WDA 2014

**OPINION OF COURT**

BY:

The Honorable Alexander P. Bicket
440 Ross Street
Suite 5069
Pittsburgh, PA 15219

Copies to Counsel of Record:

Counsel for Natural Mother:

Kiersten M. Frankowski, Esquire
Juvenile Court Project
1100 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219

Counsel for CYF:

Vanessa Love, Esquire
Office of CYF
Legal Unit-Adoption Dept.
Fort Pitt Commons, Suite 101
445 Fort Pitt Boulevard
Pittsburgh, PA 15219

Guardian Ad Litem:

Cynthia Moore, Esquire
KidsVoice
Suite 700, Frick Building
Pittsburgh, PA 15219



IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
FAMILY DIVISION

IN RE: E.A., a Minor Child

APPEAL OF: E.A., Natural Mother

Docket No.: JV-11-831

TPR No. 173 of 2013

877 WDA 2014

## OPINION

BICKET, J.                                                                          June 23, 2014

On May 5, 2014, following a hearing, this Court issued an order granting the petition of Allegheny County Office of Children, Youth and Families ("CYF") for involuntary termination of the parental rights of E.A. ("Mother"), the birthmother of E.A. (the "Child") (born Sept. 2010) pursuant to 23 Pa. C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). Mother now appeals this Order. For the reasons set forth below, the Order of this Court terminating Mother's rights to the Child should be affirmed.[1]

## History

The Child initially came to this Court's attention on April 21, 2011, when this Court granted CYF's request for an Emergency Protective Custody Order. The conditions that led to the removal and placement of the Child on April 21, 2011

---

1.     Also by Order of Court dated May 5, 2014, this Court terminated the parental rights of the Child's natural father, J.B. ("Father"), pursuant to the same subsections of 23 Pa. C.S.A. § 2511 under which Mother's rights were terminated. Father did not contest the termination proceedings and has not filed an appeal to same.

1

occurred when the Child was admitted to Children's Hospital on April 6, 2011 with seizures, retinal bleeds, and great pain. (Transcript of Testimony ("T.T.") dated 4/28/14, at 32). The Child had sustained brain injuries and Mother was not able to give a plausible explanation for how the Child sustained these injures. (T.T. at 34; CYF Exhibit 3, Shelter Care Order dated 5/3/2011). The Child's injuries were consistent with shaken baby syndrome. (T.T. at 9; CYF Exhibit 1, Psychological Evaluation Report dated 1/24/12, at p. 2)).

On June 3, 2011, the Child was adjudicated dependent and placed in foster care with Foster Parents. '. (CYF Exhibit 3, Order dated 6/3/2011). The June 3, 2011 Order finding the Child dependent also ordered that the Child be placed with Paternal Aunt, L.B. within three weeks, and provided that the parents shall have supervised visits twice a week. (Id.). The Child was thereafter placed with Paternal Aunt on July 1, 2011. (T.T. at 35).

The goals listed in Mother's initial Family Service Plan ("FSP"), effectuated on May 17, 2011, were as follows: 1) Stabilize mental health problems; 2) Achieve and maintain recovery from substance abuse problems; 3) Show an understanding of age-appropriate behavior and expectations for the Child; and 4) Prevent any more abuse or neglect of the Child. (CYF Exhibit 2, p. 1-5; T.T. at 37-38).[2] As time went on, the following goals were added to Mother's FSP: 1)

_____

2.      The CYF caseworker meets with a dependent Child's parents to develop a "Family Service Plan" which lists goals for the parents to complete to close the case. Certain tasks are given to the parents to complete under each goal. The parents' progress is reviewed every six months. (T.T. at 36-37).

2

Maintain relationship with Child through regular visits; and 2) Maintain contact and cooperation with Agency and Service Providers. (T.T. at 38).

Since the Child's removal from Mother on April 21, 2011, this Court has conducted eleven Permanency Review Hearings to review Mother's progress with respect to her FSP. (See CYF Exhibit 3, Permanency Review Orders and Permanency Review Order dated 4/28/2014). Throughout the time that the Child has been in placement, Mother has been noncompliant to moderately compliant with the permanency plan and FSP goals, and there has been minimal progress towards alleviating the circumstances that necessitated the original placement. (Id.; T.T. at 36-50). Most notably, Mother has failed to follow through on drug and alcohol treatment, as well as mental health treatment, and she has failed to have consistent visitation with the Child. (See CYF Exhibit 3, Permanency Review Orders and Permanency Review Order dated 4/28/2014).

On September 6, 2012, the Child was removed from the Paternal Aunt's home because of inappropriate and deplorable conditions as well as unapproved caregivers being permitted to care for the Child, including Mother. (T.T. at 35-36; CYF Exhibit 3, 9/7/2012 Shelter Care Order). At that point, the Child was placed back in the care of Foster Parents, where he remains to this date. (T.T. at 35-36; CYF Exhibit 3, Orders of Court dated 9/6/2012 and 9/7/2012).

On October 11, 2012, the placement goal for the Child was changed from a return to Mother to the goal of another living arrangement intended to

3

be permanent in nature, specifically "Other Permanent, Legal Arrangement" ("OPLA"). (CYF Exhibit 1, Permanency Review Order dated 10/11/2012). A return to Mother was found to not be appropriate and/or not feasible. (Id.)

On April 28, 2014, following a consolidated hearing with respect to CYF's request to change the permanency goal to adoption and to terminate Mother's and Father's parental rights, this Court changed the permanent placement goal to adoption and terminated the parental rights of both Mother and Father pursuant to 23 Pa. C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). Mother filed a timely appeal to this Court's Order terminating her rights. In her Concise Statement of Matters Complained of on Appeal, Mother's only error complained of is that "(t)he trial court abused its discretion and/or erred as a matter of law in concluding that termination of Natural Mother's parental rights would serve the needs and welfare of the child pursuant to 23 Pa. C.S.A. § 2511(b)."

## Analysis

A party seeking termination of parental rights must establish by clear and convincing evidence that the parent's conduct satisfies at least one of the statutory grounds for termination; once it is determined that this burden has been met, then the trial court must next consider whether termination best serves the needs and welfare of the child. (In re S.D.T., Jr., 934 A.2d 702 (Pa. Super. 2007)). Accordingly, once statutory grounds for involuntary termination of parental rights have been clearly shown, the Court must consider whether the

4

termination would meet the needs and welfare of the child pursuant to 23 Pa. C.S.A § 2511(b), which states:

> (b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishing, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of petitions.

When considering the needs and welfare of the child, the court must also consider the presence of any parent-child emotional bond, which encompasses intangibles such as love, comfort, security, and stability, and the effect that a severance of that bond would have on the child. (In re T.M.T., 64 A.3d 1119, 1127 (Pa. Super. 2013)(internal citations omitted)).

Here, by not raising the issue on appeal, Mother has conceded that CYF met its burden by clearly and convincingly proving the elements necessary to terminate Mother's rights under 23 Pa. C.S.A §§ 2511 (a)(1), (a)(2), (a)(5), and (a)(8). As such, this opinion only addresses whether the Child's developmental, physical and emotional needs and welfare would be met by terminating Mother's parental rights. Based upon the following facts and credible testimony from licensed psychologist Doctor Patricia Pepe (See T.T. at 4-27) and CYF caseworker Jaime Greenberg (See T.T. at 28-59), this Court believes that the

5

requirements of 23 Pa. C.S.A. § 2511(b) have been met and that the Child's needs and welfare would be best served by the termination of Mother's rights.

Dr. Pepe performed Individual Psychological Evaluations on Mother on January 24, 2012, July 3, 2012, and on November 26, 2013; Interactional Evaluations with Mother and Child on October 24, 2012 and November 26, 2013; and an Interactional Evaluation with Child and . Foster Parents on November 26, 2013. (See CYF Exhibit 1; T.T. at 6-7). The Child has special needs and has significant developmental delays because of a brain injury. (T.T. at 15, 19, 21, and 51). The Child also has a seizure disorder and receives physical, speech, and occupation therapy; services which were obtained by CYF. (Id. at 51). As such, the Child will need significant care and attention in the future. (Id. at 22).

With respect to Dr. Pepe's initial psychological evaluation of Mother that occurred on January 24, 2012, Dr. Pepe testified that Mother appeared to be suffering from significant depression, that she suffered a history of extensive child abuse and trauma, and that she was very fragile psychologically and was obviously stressed. (T.T. at 9). Dr. Pepe also testified that Mother had indicated that she had a history of cannabis abuse and drinking. (Id. at 10). Mother also showed signs of significant clinical depression. (Id.) Dr. Pepe initially diagnosed Mother with depressive disorder not otherwise specified. (Id. at 11). Nonetheless, Dr. Pepe believed that Mother showed signs that she was still able to function within the daily life, because she had been maintaining her own

6

housing, she was employed, and she had been showing some degree of stability at this time. (Id. at 12). At the time, Mother showed positive signs that would suggest reunification could be possible. (CYF Exhibit 1, Psychological Evaluation Report dated 1/24/12, at p. 4). However, Mother was also showing significant impact from psychological issues as a result of a traumatic childhood, so Dr. Pepe recommended that Mother participate in outpatient psychotherapy. (Id.; T.T. at 12).

According to the psychological evaluation of Mother that occurred on July 3, 2012, Dr. Pepe added a diagnosis of post-traumatic stress disorder. (T.T. at 12). At this time, Mother showed a decrease in and more difficulty with functioning with respect to her stability and psychological systems. (Id. at 13). Dr. Pepe also found that Mother was having problems with drugs, was poorly motivated to address her FSP goals, and that she needed to continue with outpatient psychotherapy. (Id.).

As to the Interactional Evaluation performed by Dr. Pepe with respect to Mother and the Child on October 24, 2012, Dr. Pepe testified that it took the Child a little bit to warm up to Mother, but at times he did. (Id. at 14). Dr. Pepe also believed that Mother exhibited positive and appropriate parenting skills. (Id. at 14-15). However, Dr. Pepe was concerned about Mother's lack of individual stability because Mother had not been involved with mental health treatment for a sustained period of time. (Id. at 15). Dr. Pepe also believed Mother would need a great deal of information about parenting special needs

7

children. (Id.). Dr. Pepe opined that Mother seemed sincere in wanting to make progress, but that she continued to sabotage herself and was clearly in need of intensive treatment. (Id.; CYF Exhibit 1, Psychological Evaluation Report dated 10/24/2012, at p. 3).

As to the psychological evaluation of Mother that occurred on November 26, 2013, Dr. Pepe opined that Mother had not made any progress since her January 24, 2012 evaluation. (T.T. at 16). Mother continued to exhibit a lack of stability, and she no longer had stable housing or employment. (Id.). At this time, Mother lacked trust in others, she had difficulty with motivation, and she still had significant problems with her depression and post-traumatic stress disorder. (Id. at 17). Dr. Pepe testified that Mother lacked "the individual stability to care for herself and care for her child." (Id.). Mother's diagnosis after this evaluation was post-traumatic stress disorder, depressive disorder not otherwise specified, panic disorder, and a history of cannabis abuse, and Mother's stability was found to be in continual decline. (Id. at 18).

As to the Interactional Evaluation performed by Dr. Pepe with respect to Mother and the Child on November 26, 2013, Dr. Pepe testified that the Child was comfortable in Mother's presence, was familiar with her, and was spontaneously (affectionate) towards her. (Id. at 19). Mother also exhibited appropriate parenting skills at this evaluation. (Id.). However, Dr. Pepe again opined that Mother would need a great deal of training with special needs children. (Id.). Dr. Pepe indicated that it was unclear whether the Child

8

recognized Mother as his mother, but described the attachment between Mother and Child as "generally positive." (Psychological Evaluation Report dated 11/26/2013, at p. 4; T.T. at 20). However, Dr. Pepe felt that Mother has not been able to meet the expectations for parenting (T.T. at 24) and was not exhibiting the individual stability to parent. (CYF Exhibit 1, Psychological Evaluation Report dated 11/26/2013, at p. 8). Dr. Pepe believed Mother had to first take care of herself before she addressed the specifics of parenting a special needs child. (T.T. at 26).

Jaime Greenberg, the caseworker from CYF assigned to this family, credibly testified that Mother failed to complete some of her FSP goals; goals which would have addressed the above-stated issues that have been raised by Dr. Pepe throughout the history of this case. (Id. at 28-53). Mother's mental health diagnoses and substance abuse issues were concerns that have caused the Child to remain in placement. (Id. at 35). Mother has never fully addressed her drug and alcohol or mental health problems. She was referred to Power for a dual diagnosis to address both of these goals, but she never completed the program. (Id. at 39-42). Mother did complete a parenting program, but she never followed through with her drug and alcohol or mental health programs. (Id. at 42; CYF Exhibit 3, Permanency Review Order dated November 25, 2013). As of the date of the termination proceeding, Mother's goals of addressing her drug and alcohol and mental health problems had yet to be completed and the issues continued to exist. (T.T. at 42, 49). Furthermore, Mother has had

9

inconsistent contact with the Child since the Child has been in placement, which was another one of her FSP goals. (Id. at 44, 45-46).

Since September 6, 2012, the Child has been in the care of Foster Parents. On November 26, 2013, Dr. Pepe performed an Interactional Evaluation with the Child and Foster Parents. Dr. Pepe testified that when the Child was separated from Foster Parents, the Child exhibited extreme separation anxiety. (Id. at 21; Psychological Evaluation Report dated 11/26/2013, at p. 2)). Foster Mother is a pediatric nurse and understands the Child's problems. (T.T. at 22). Foster Mother is also aware that the Child is going to need a great deal of care and supervision into adulthood and she is willing to provide it. (Id.). Since the Child has been in placement with Foster Parents, he has made a lot of progress. (Id. at 21). Dr. Pepe opined that if there was any hope for the Child to have any type of normal life, that he would need an extensive, enriched environment, and that Foster Parents appear to be providing this environment in the Child's current placement. (Id. at 23). The Child exhibited bonding behaviors suggesting that his primary attachment was to Foster Parents (Id.) Dr. Pepe also stated that the Child refers to Foster Parents as "mommy" and "daddy." (Id.) Foster Parents, exhibited excellent parenting skills. (Id.) Dr. Pepe believed that Foster Parents were meeting the Child's educational, psychological and developmental needs. (Id.). Dr. Pepe also opined that termination and adoption meet the Child's needs and welfare. (Id. at 24). Based upon the entirety of the evaluations and

10

the Child's need for permanency, Dr. Pepe concluded that it would be in the best psychological interest for the Child to remain with Foster Parents on a permanent basis through adoption so that he could be raised in an enriched environment where his multitude of special needs can be addressed. (CYF Exhibit 1, Psychological Evaluation Report dated 11/26/2013, at p. 8).

Additionally, Ms. Greenberg also testified that the Child identifies Foster Parents as "mommy" and "daddy." (Id. at 51). She further testified that the Child sees Foster Parents' other children as his siblings and he interacts with them as a sibling. (Id.). Foster Parents are currently willing to adopt the Child. (Id.). Ms. Greenberg, on behalf of CYF, also concluded that termination would meet the Child's education, emotional, physical and development needs and welfare. (Id. at 52).

This Court agrees with Dr. Pepe and CYF that termination of Mother's parental rights followed by adoption would best meet the developmental, physical and emotional needs and welfare of the Child. As the above facts indicate, Mother has on-going serious mental health issues, drug and alcohol issues, and a lack of stability in her life. She has failed to address these issues over the past three years while the Child has been in placement.[3] Furthermore, Mother's visitation with the Child has been sporadic. The Court recognizes that

---

3. Mother testified that the reason she has been unable to address these issues were due to transportation and phone issues. (T.T. at 61-63). However, Mother knew what her goals were throughout the case, CYF provided Mother with Port Authority passes, and this Court finds it hard to believe that the transportation and phone issues continued the entire time the Child was in placement.

11

Mother and Child have a positive attachment. However, Mother has difficulty taking care of herself; let alone taking care of a Child with special needs. Furthermore, the Child has a need for permanency. Foster Parents are willing and able to care for the Child and his special needs on a permanent basis. The Child has developed a primary bond with Foster Parents · and has also bonded with their children. For these reasons, this Court believes that CYF has met its burden by clearly and convincingly showing that termination of Mother's parental rights would be in the Child's best interest. Accordingly, this Court's decision to terminate Mother's parental rights should be affirmed.

BY THE COURT:

_____ J.
Alexander P. Bicket