J-S73016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: J.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.T., MOTHER | No. 1268 MDA 2014 |

Appeal from the Order Entered July 3, 2014
In the Court of Common Pleas of Lancaster County
Orphans' Court at No: 45 of 2014

BEFORE:  BOWES, J., WECHT, J., and MUSMANNO, J.

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 03, 2014**

C.T. ("Mother") appeals the July 3, 2014 order that terminated her parental rights to J.R. ("Child").[1]  After careful review, we affirm.

The trial court summarized the procedural and factual history of this case as follows:

> This matter comes before the court on the Petition filed by the Lancaster County Children and Youth Social Service Agency (hereinafter "Agency") to terminate the parental rights of [J.R. ("Father")] and [Mother (collectively, "Parents")], birth parents of [J.R. ("Child").]  The petition was filed on January 8, 2014 and notice in accordance with the provisions of the Adoption Act was provided to Parents.  The petition was served on Parents on February 25, 2014.  [Child] has now been in placement for almost 18 months.  A full hearing was held on March 25, 2014, and then additional testimony was presented on April 22, 2014. Juvenile records were incorporated fully at the termination hearing on March 25, 2014.

_____

[1]  The court also terminated the parental rights of J.R. ("Father") in the July 3, 2014 order.  Father also filed a notice of appeal which was docketed at 1325 MDA 2014.  That appeal is disposed of in a separate memorandum.

\* \* \*

The relevant facts are as follows: [Child] is a minor child born [in November 2012], in Lancaster County, Pennsylvania. At the time of [Child's] birth, Mother and Father were living together in a motel room at Penns Woods Inn, in Manheim with three other people. Additionally, Mother had a previous history with the Agency, and her first[-]born child was placed with a family friend under a safety plan that was developed due to neglect [of the child] while under Mother's care. Mother's older child was subsequently adopted by the resource family.

Due to these concerns, [Child] was released from the hospital under a safety plan on December 13, 2012. On December 15, 2012, the safety plan family contacted the Agency and stated they were no longer willing to keep the child. [Child] has been in Agency care since December 16, 2012. [Child] was placed in the resource home that adopted his older half-brother and has done very well there. At the time of placement, the Agency was very concerned with Mother and Father's inappropriate housing, Mother's mental health and their parenting skills.

The court approved a Child Permanency Plan that included the following goals for both Mother and Father: mental health, parenting, income, housing, and commitment to the child. At the hearing, the caseworker testified that she had provided them with information on low-income housing and how to apply for it. She also spoke to them about websites they could use to find housing and how to look in the newspaper. At that time, the caseworker also offered to continue providing the information and assist in filling out applications. Both parents have completed their mental health goals, have demonstrated a commitment to the child by regularly attending visits, and now have sufficient income. However, Parents have been unable or unwilling to find appropriate housing for the child. Mother and Father were also unable to start working on the parenting goal, as the Personalized Parent Trainer [("PPT")] could only be put in place once the housing goal was met.[3] In addition to verbal communication, the Agency sent letters to Parents on June 6, 2013, August 5, 2013, September 4, 2013 and December 9, 2013 in which [it] encouraged Parents to keep the Agency updated and to find housing so that a referral to a [PPT] program could be made. [Child] has now been in placement for almost 18 months.

³ The Agency determined that a parenting class would not be sufficient to satisfy the parenting goal, due to Mother's demonstrated parenting deficits with her older child.

At the first review hearing on June 4, 2013, the caseworker testified that Mother and Father were still residing at the Penns Woods Inn, but they had plans for housing. The caseworker also testified that she explained to Mother and Father that she could not make a referral to a Personalized Parent Trainer until there was more stable and appropriate housing. The caseworker stated, "I think that they're both committed to getting housing, and I think that knowing that the biggest step, being the parenting, can't start until that happens . . . I think, if anything, they're definitely going to make sure they have it done now."

The caseworker testified that, in 2013, Father was reporting to the Agency that he was making $800 per week. In actuality, Father had made approximately $5,000 for the entire year of 2013. Mother reported to the Agency that she was filing for SSI and would receive around $900 per month. Based upon the income being reported to the caseworker, the Agency did not provide services to help Parents apply for low-income housing. Additionally, Parents repeatedly indicated to the caseworker that they were identifying appropriate housing and therefore did not need support finding a place to live. The parents are solely responsible for the misinformation given to the Agency and Court concerning their income and housing prospects, which directly affected the services provided to them.

Father first told the Agency that he had trouble locating housing in October of 2013, after the child had been in placement for 10 months. At a hearing before the Master on October 2, 2013, the caseworker stated: "The income is less than we expected. Part of the Agency's sort of hands-off approach at finding housing was an impression to us that they had sufficient funds . . . So there will be some additional efforts put forth in terms to help to find some housing." The caseworker again stated that the PPT would only be willing to work with the family in a potentially permanent home, and they would not accept a referral while Mother and Father continued to reside in the motel. [The] caseworker also testified that Parents indicated that part of their struggle finding housing was their low credit score. The

caseworker had made calls to Tabor[2] but had not been called back. The caseworker also testified that she was going to ask Mother and Father to sign a release so she could talk with the landlord to figure out what it would take for Parents to switch from the motel room to an apartment on the same premises.

The caseworker spoke with Father in November 2013, and he told her that a family friend was willing to rent them a basement apartment for $250 or $500 a month,[13] which was less than what they paid to the motel. The caseworker testified that at that time she told Father that was a good option, because even if it was not appropriate for the child, they would save money to put towards an apartment. The caseworker stated that Father told her in December that moving into the basement apartment would not happen, as he did not think it would be the right place for the child. At this point, [Child] had been in Agency custody for a year.

> [13] The record is unclear. The caseworker originally testified that the rent of the basement apartment would be $450-$500, but later stated that it was $250. Parents were paying about $750/month at the motel where they were staying.

At the initial termination of parent rights and review hearing on February 25, 2014, the caseworker stated that the parents had progressed only minimally on their child permanency plans since the first review. The caseworker stated, "They certainly took a lot of steps early on, but there seems to be not much follow-through lately." [He] testified that parents still did not have stable income, they continued to reside in the Penns Wood Inn, and therefore had not been referred for parenting. The caseworker also testified that Parents had completed the mental health component of their plans and continued to attend and behave appropriately at visits [with Child], however they did not seem dedicated to completing their plans. The caseworker stated that [he] was suspicious as Parents kept telling [him] that they were applying for housing, but had not provided [him] with any names, applications, or records of income.

---

[2] Tabor is a Lancaster County community organization that assists with housing and provides financial counseling.

Father testified at the [February 2014] hearing that he was laid off from Good's Dairy in November of 2013, where he worked for 8 years, and only earned approximately $5,000 before he was let go in 2013. He had earned approximately $800 per [week] (approximately $40,000 a year) in prior years. He stated that he had filed for unemployment but was denied due to inadequate hours, and at the time of the hearing his appeal was still pending. Father stated that he was unable to obtain employment because he needed Monday afternoons off in order to attend visits. Father told the Court that his friend was buying a lot with a house on it, and hopefully they could move in by March 1, 2014. The caseworker met with Father on March 3, and he told the caseworker that he would be meeting with the landlord later that week to sign a lease. Prior to the termination of parental rights hearing on March 25, 2014, Father informed the caseworker that they would not be moving into that property in the immediate future as the current tenant was still living in the house and the potential landlord had not purchased the property yet. At this point [Child] had been in care approximately 15 months.

The termination of parental rights hearing was continued to April 22, 2014 in order for Parents to prepare their testimony and the potential landlord's testimony. When the Court reconvened in April, Parents had changed their plan yet again, and were no longer going to live in the house from the March hearing, and were now planning on renting a house with Father's birth mother, [D.C.].[29] Both Father and [D.C.] testified that they had signed a lease on a duplex, and would be moving in June 1, 2014. A copy of the lease was presented at the hearing, marked as an exhibit and admitted to the record. As of the June 1, 2014 occupancy date, [Child] would be in care for approximately 16 months.

[29] Father's birth mother has a history with the Agency. She placed Father for adoption when he was an infant. Father did not have any contact with his birth mother until very recently.

Trial Court Memorandum and Order ("T.C.M."), 7/3/2014, at 1-6 (some footnotes omitted; minor modifications to capitalization and punctuation).

Following the hearings, on July 3, 2014, the trial court issued a memorandum and order that terminated Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b). On July 24, 2014, Mother filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On August 13, 2014, the trial court filed a Pa.R.A.P. 1925(a) opinion.

Mother raises two issues for our review:

A. Did the court err by allowing the Children and Youth Agency to determine the requirements needed to satisfy the parenting goal of the child permanency plan and then finding that Mother failed to complete the Agency's parenting requirements, rather than making an independent judicial determination?

B. Did the court err in finding that the Children and Youth Agency provided sufficient assistance to the parents regarding the completion of the parenting and housing goals of the child permanency plan such as would justify termination of their parental rights?

Mother's Brief at 4.

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Mother's parental rights pursuant to section 2511(a)(8) and (b), which provides in relevant part:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not

consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child's] removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the child welfare agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the child welfare agency's] services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

With that background, we turn to Mother's first issue. Mother argues that the trial court abdicated its role to the Agency in allowing the Agency to determine that a PPT was the only method by which Mother could satisfy the parenting goal. Mother also contends that, prior to the termination proceedings, the trial court did not clearly state that working with a PPT was the only possible way to meet the goal. Mother's Brief at 7-9.

The trial court stated that, based upon Mother's previous involvement with the Agency, it had "serious concerns" about Mother's ability to parent. Trial Court Opinion ("T.C.O."), 8/13/2014, at 1. Therefore, the trial court

- 8 -

determined that a PPT was necessary to alleviate those concerns, that parenting classes or other alternatives would not have provided enough guidance to ensure that Mother could parent Child adequately, and that the PPT was the only method by which Mother could meet her goal. *Id.* at 1-2. Because Mother's housing was not appropriate, the PPT could not work with Mother in her residence to assess her parenting or work with her and Child. *Id.* at 2.

We find nothing in the record to contradict the trial court's statements. At the last permanency review in February 2014, the trial court stated that the parenting referral could not occur until housing had been secured. Notes of Testimony ("N.T."), 2/25/2014, at 31-32. Further, the record supports the court's concerns about Mother's parenting skills. With regard to Mother's other child, among other issues, the child was found with overflowing diapers, Mother had left medication on the floor to which the child had access, and Mother ignored the child while he was crying. N.T., 3/25/2014, at 51-52. While the court did state in a footnote that the Agency determined that Mother required a PPT, there is nothing in the record to indicate that the court abdicated its role and did not adopt that requirement. Further, Mother points to no case law that prohibits a trial court from adopting a agency's recommendations.

In her second issue, Mother argues that the Agency did not make reasonable efforts to assist Mother in meeting her goals. Specifically, Mother contends that the Agency should have not conditioned the parenting

goal upon her attaining adequate housing. Mother also argues that the Agency did not provide adequate assistance to Mother in finding housing. Mother contends that the record does not support the trial court's determination that Mother and Father were not credible regarding their housing. Mother's Brief at 9-11.

Matthew McCafferty, the caseworker, testified that he tried to get Mother assistance through Tabor, but was unable to do so. N.T., 2/25/2014, at 17, 20. Mr. McCafferty had been informed about various plans from Mother and Father about housing, but that Mother and Father never provided any details, such as lease applications, names of contacts, or any records. *Id.* at 19-21. Mr. McCafferty stated that housing has been a main issue for Mother and that he had attempted to stress the importance of adequate housing since he became involved in the case. *Id.* at 22. At the termination hearing, Mr. McCafferty testified that Mother or Father told him four or five different times that they had secured housing, only to have it not work out. N.T., 3/25/2014, at 19, 33. Additionally, Parents' place at the motel was a single, small room with a microwave and an adjoining bathroom. *Id.* at 19-20.

The trial court concluded that Mother misled the Agency about the housing situation. T.C.M. at 7. The court found that Mother was aware that housing was a paramount issue and that she did not progress toward meeting this goal. *Id.* Further, Mother's lack of transparency about housing caused the Agency to provide less assistance than it might otherwise have

provided. T.C.O. at 2. The trial court concluded that Mother and Father were the sole cause of their lack of appropriate housing. T.C.M. at 8.

We previously have affirmed the termination of parental rights where a parent has made progress toward his or her goals, but has not yet remedied all the conditions that lead to removal. *See In re C.L.G.*, 956 A.2d 999, 1005 (Pa. Super. 2008) (*en banc*) ("[A]lthough Mother exhibited substantial progress in meeting the Agency's objectives, she ultimately was unable to care for C.L.G. because, twelve months later, she could not provide the requisite parenting and adequate housing."). Here, Mother made progress on her mental health goals. However, she has not secured housing, which has also prevented her from starting the program that was necessary to ensure that she can safely and adequately care for Child. While Mother blames the Agency for not providing enough services, the record supports the trial court's conclusion that it was Mother who was not forthcoming with the Agency. Further, as noted above, the court and Agency had adequate reasons to require a PPT. The PPT would only work with Mother and Child on parenting once Mother had adequate housing. Mother was aware of this requirement, and it was her failure to secure reasonable housing that delayed her ability to focus upon the necessary parenting skills training.

Even if Mother's most recent proposed housing alternative with D.C. comes to fruition, Mother still would have to complete her parenting goal before Child could be returned. Child had already been in the Agency's custody for almost eighteen months when the trial court ruled. It is

unknown how much longer it would take Mother to complete her goals, or even if she can complete them. "[A] child's life 'simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.'" *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (quoting *In re Adoption of M.E.P.,* 825 A.2d 1266, 1276 (Pa. Super. 2003)). Based upon the record before us, the trial court did not abuse its discretion in terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/3/2014