J-S42028-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.A.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.M., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 338 MDA 2018 |

Appeal from the Order Entered January 17, 2018
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
4223

BEFORE:  BOWES, J., McLAUGHLIN, J., and STRASSBURGER*, J.

MEMORANDUM BY McLAUGHLIN, J.:           **FILED AUGUST 24, 2018**

R.M., Jr. ("Father") appeals from the order terminating his parental rights to S.A.M. ("S.A.M." or "Child"). We conclude the trial court did not abuse its discretion in terminating Father's rights and, therefore, affirm.

Child was born in March 2016 and was removed from the care of Father and L.M. ("Mother") shortly after birth. On March 4, 2017, Centre County Children and Youth Services ("CYS" or "Agency") filed a Petition to Terminate Parental Rights. The trial court held a hearing.

The trial court set forth the following factual history:

> CYS first became involved in this matter on learning of Mother's pregnancy with S.A.M. in September of 2015. At that time, there was an ongoing dependency proceeding with respect to another child of Parents that began in 2010 when Mother was pregnant with the couple's first child, R.M.
>
> A summary of the Agency's involvement in the R.M. case is necessary to a full understanding of the present matter. Before R.M.'s birth, CYS sought to engage Mother and

_____

\* Retired Senior Judge assigned to the Superior Court.

Father in preventative services due to concerns stemming from Father's status as a convicted sex offender and a sexually violent predator ("SVP"). Father's SVP status was determined by Judge Thomas Kistler on October 17, 2005 in connection with convictions for sexual assault, aggravated indecent assault, two counts of indecent assault, and two counts of corruption of minors. Testimony at the September 5, 2017 hearing recounted that, although Mother and Father participated in in-home Parenting Plus services for a brief period during Mother's pregnancy, they subsequently discontinued the services and refused further preventive services offered by the Agency. R.M. was born in July of 2010 and taken into emergency custody by CYS. A dependency petition and adjudication followed, and R.M. was adjudicated a dependent child and placed in the care and custody of the agency. Agency concerns revolved around potential risks posed by Father's SVP status and related issues, Mother's physical and cognitive limitations, Mother's failure to appreciate or acknowledge the potential risks posed to the child due to Father's SVP status, and an inability of Mother to care for and protect the child, even with assistance and support from Mother's family due to their inability to stand up to Father.

Mother and Father were provided reunification services with respect to R.M. through Family Intervention Crisis Services ("FICS").[3] Those services included development of service agreement goals, parent education sessions, individual and family sessions, with both parents and with each parent separately, and supervised visits with R.M.

[3] Father was subject to an aggravated circumstances order, and, thus, reunification services were not ordered; however, because Father was living in the home with Mother, the agency incorporated Father into the services.

. . .

As to Father, there were significant concerns regarding Father's mental health and stability. A major issue was Father's SVP status and his failure to continue with legally mandated counseling and treatment associated with that designation. Father also failed to manage his treatment needs for a seizure disorder. In addition, he was

- 2 -

argumentative with service providers, and refused to take prescription medications for treatment of his anger and mood disorder.

Reunification services with respect to R.M. continued for approximately nine to twelve months as the Agency and its service providers attempted to work with Mother and Father to try to surmount the identified safety issues. Mother and Father failed to make significant progress, however, and reunification services were ultimately deemed unsuccessful and a petition for involuntary termination of parental rights as to R.M. was filed. Mother and Father subsequently agreed to voluntarily relinquish their parental rights to R.M., and R.M. was adopted by her foster placement family.

In September of 2015, CYS learned that Mother was pregnant with a second child, (S.A.M.), and the Agency became involved with Mother and Father again at that time to address the previously unresolved parenting issues. There were no immediately available services as of that time. Ongoing assessment by the Agency demonstrated that very little had changed since the Agency's past involvement with Mother and Father. Parenting deficits were still present, and Mother continued in her failure to recognize the potential danger presented by Father. In addition, Mother is meek and passive, and the Agency observed that she is often controlled by people in her life, particularly Father. There were no other adults who could provide the care and supervision necessary to ensure the child's safety and well-being due to Parents' limitations and the safety risk posed by Father. Although Parents lived with Mother's parents (Maternal Grandparents) at that time, CYS' observation during prior experience with the family was that Maternal Grandparents, like Mother, would not stand up to Father.

Mother gave birth to S.A.M. on March 4, 2016. On that same date, CYS filed an emergency petition, and emergency custody was transferred to the Agency. S.A.M. was discharged from the hospital on March 6, 2016 to a kinship foster home placement, in the same home as her biological sister, R.M.[4] A dependency petition was filed, and an adjudicatory hearing was held on March 16, 2016. Evidence demonstrated that Mother and Father's circumstances had not materially changed since the Agency's involvement with the first child. S.A.M. was adjudicated dependent following

the March 16, 2016 hearing, and her placement goal was identified as adoption. An aggravated circumstances Order was entered on that same date against Father based on clear and convincing evidence of Father's criminal history of convictions for sexual offenses against minors, his status as a sexually violent predator, and his related registration and reporting requirements. The aggravated circumstances Order provided that reunification services would not be provided as to Father.

[4] Subsequently, a third child was born to Mother and Father, H.M., who also was placed in the same foster home after a dependency adjudication.

Following the dependency adjudication, regular visitation was offered to both Mother and Father, and it was observed that both struggled with basic child care tasks such as changing diapers, and Mother continued to struggle with recognizing cues and preparing bottles and changing clothes. . . .

Father's circumstances continue to pose significant safety risks for the Minor Child. During the time S.A.M. has been in placement, Father has refused to cooperate with CYS and to provide requested information regarding his SVP offender treatment or his mental and/or physical health. The only information available to the Agency indicated that Father had not been consistently enrolled in counseling, and that he is still designated as at high risk for re-offending. Father also suffers from a seizure disorder, fainting, and medical ailments that are not well controlled and that impact his ability to safely hold and care for an infant or young child. Father struggles with mood regulation, and CYS observed him to have mood swings and to be volatile and threatening toward workers on occasion. At the time of the TPR hearing, Father was in jail awaiting trial on charges that he failed to comply with the registration requirements attendant to his SVP status.[1]

The ongoing nature of the concerns regarding Father's SVP status and failure to consistently participate in treatment, as well as his overall mental and physical health,

---

[1] The Huntington County Court of Common Pleas dismissed the failure to register charges on January 8, 2018. Docket, CP-31-CR-0313-2017.

make unsupervised time between Father and S.A.M. an unrealistic possibility due to serious safety concerns for the child. In addition, during supervised visits offered through the Agency, Father has not been able to demonstrate an ability to meet S.A.M.'s needs.

In addition to the above, Mother and Father do not have stable housing. At the time the TPR Petition was filed, they were still living with Mother's parents. Since that time, however, they left that residence and were homeless for a time, staying in a homeless shelter in another county. As noted above, Father was cited and arrested on allegations of failing to comply with his SVP registration requirements by failing to register the new address at the homeless shelter. He has been incarcerated in Huntingdon County on those charges since early June of 2017. Mother testified that she once again lives in her parents' home, but the Agency was not able to verify that at the time of the hearing.

. . .

S.A.M. is thriving in her foster home and interacts with her foster parents as if she were their child. She is physically and developmentally on track. She interacts in play with her older biological sibling in the home, as well as with two foster siblings. At the age of 18 months old, S.A.M. was saying a few words. She referred to her foster parents as mom and dad. S.A.M.'s foster parents have facilitated supervised visits with Mother and Father. During the visits, when S.A.M. was distressed or needed comfort, she went to her foster mother for support instead of Mother. S.A.M.'s foster parents have provided for her physical and emotional needs since her discharge from the hospital just after her birth. [Casie] Rockey[, a CYS case supervisor,] testified that termination of Parents' parental rights would give S.A.M. the opportunity to be adopted by her foster family, who has cared for her since birth. This would provide permanency and would allow her to be raised in the home of a full biological sibling.

Trial Court Opinion, filed Jan. 17, 2018, at 2-8 (internal citations and some footnotes omitted).

- 5 -

The trial court found grounds for termination existed under 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (11), and found termination proper under Section 2511(b). Father filed a timely Notice of Appeal.

Father raises the following issues on appeal:

> 1) Did the Trial Court commit an error of law in applying 23 Pa.C.S.A. 2511(a)(11) and terminating Father's parental rights pursuant to that statute, as it was not yet enacted when S.A.M. was conceived?
>
> 2) Did the Trial Court incorrectly find clear and convincing evidence existed to terminate Father's parental rights pursuant to 23 Pa.C.S.A. 2511(a) (2), (5), and (8) where no assessment[] was conducted, but instead the Agency merely relied on the lack of progress Father made in a prior case years before?
>
> 3) Did the Trial Court incorrectly determine that sufficient evidence was presented to terminate Father's parental rights?

Father's Br. at 2.

When reviewing orders terminating parental rights, we must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). Where "the factual findings are supported," we review the decision "to determine if the trial court made an error of law or abused its discretion." *Id.* We will reverse a decision "for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.*

The Pennsylvania Supreme Court has explained the reason for applying an abuse of discretion standard to termination decisions:

> [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Id.* at 826-27 (citations omitted).

A trial court may terminate parental rights only after finding grounds for termination existed under Section 2511(a) and that termination is in the child's best interest under Section 2511(b). Although the trial court terminated Father's parental rights pursuant to several subsections of 2511(a), we need only conclude that its decision was proper under any one subsection of Section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we conclude that the trial court properly terminated Father's parental rights pursuant to Sections 2511(a)(2).[2]

Section 2511(a)(2) provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .

---

[2] Because we conclude the trial court properly found grounds for termination under Section 2511(a)(2), we will not reach Father's first issue, challenging the termination under Section 2511(a)(11).

- 7 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To terminate parental rights pursuant to Section 2511(a)(2), the moving party must produce clear and convincing evidence of the following: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003).

Father claims that the finding that termination was proper under Section 2511(a) was based on information from Father's involvement with CYS with a prior child and that CYS failed to present evidence that he has current inability to parent Child. We disagree.

Here, the trial court found aggravated circumstances as to Father based on his convictions. Aggravated Circumstances Order, filed March 17, 2016; *see* 42 Pa.C.S.A. § 6302 (defining aggravated circumstances).[3] The trial court

---

[3] Father did not appeal the order finding Child dependent or the trial court's finding that aggravated circumstances existed, and does not challenge the aggravated circumstances order in this appeal. *See In re R.C.* 945 A.2d 182,

further found that CYS need not engage in reasonable efforts to reunify Father and Child. *See* Aggravated Circumstances Order.

The trial court noted that the "record is replete with testimony that most all of the concerning circumstances and conditions existing when services were provided for R.M. continued to exist on the birth of S.A.M. and thereafter." TCO at 13. The trial court reasoned that termination was proper, in part, because Father refused to cooperate with CYS by not providing information regarding his psychological and medical treatment, "despite many concerns about his mental and physical conditions and how those conditions impact his ability to parent." *Id* at 12. The trial court further noted that Father failed to show "progress with respect to the limitations on his ability to meet the basic needs of an infant or young child despite the services provided to him during supervised visits." *Id.* at 12-13.

The trial court's factual findings are supported by the record, and the findings support the trial court's conclusion that Father had a continued incapacity that caused Child to be without parental care, control or subsistence, and that the cause of the incapacity could not be remedied. The

---

184 (Pa.Super. 2008) (aggravated circumstances order may be appealed as collateral order); *In re Estate of Petro*, 694 A.2d 627, 631 (Pa.Super. 1997) ("We can find no rule of law, either statutory or common law, which states that a collateral order *must* be appealed within 30 days of its entrance or an appeal based upon the substance of the collateral order is forever precluded." (emphasis in original)).

trial court did not abuse its discretion in finding grounds for termination of parental rights existed under Section 2511(a)(2).

We next address the trial court's conclusion that termination would best serve Child's developmental, physical and emotional needs and welfare under Section 2511(b). Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

The focus under Section 2511(b) is not on the parent, but on the child. *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*). Pursuant to Section 2511(b), the trial court must determine "whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa.Super. 2005). This Court has explained that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into [the] needs and welfare of the child." *Id.* at 1287. The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id*.

- 10 -

The trial court found termination would be in Child's best interest. It reasoned that Child is thriving in her foster placement, is physically and developmentally on track, and the foster parents are meeting her physical, emotional, and medical needs. TCO at 15. The trial court further noted that Child lives with her biological sister, R.M., and has two foster siblings. The court stated there was no evidence of a bond between Child and Father. It concluded that termination would not "destroy an existing relationship necessary and beneficial for child" and that Child's "needs and welfare are best fulfilled by terminating both Mother and Father's parental rights." *Id.* at 15-16.

The record supports these factual findings and the trial court did not abuse its discretion in finding termination would best meet Child's developmental, physical and emotional needs and welfare. Further, contrary to Father's assertion, the trial court did not need a bonding evaluation where it found no evidence of a bond and where the record supported its findings. *See In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.").

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/24/2018