J-A21022-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.M.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1011 EDA 2024 |

Appeal from the Decree Entered March 5, 2024
In the Court of Common Pleas of Wayne County Civil Division at No(s):
2023-00026

BEFORE:  KUNSELMAN, J., NICHOLS, J., and BECK, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED JANUARY 8, 2025**

J.S. (Mother) appeals from the decree granting the petition for Involuntary Termination of Parental Rights (TPR) filed by Wayne County Children and Youth Services (Agency) that terminated her parental rights to B.M.S. (Child), who was born in December of 2019 and was four years old at the time of the TPR hearing on January 30, 2024.  Mother argues that the trial court abused its discretion and committed legal error by terminating her parental rights and by concluding that termination was in Child's best interests.  Mother further contends that there was insufficient evidence to terminate her parental rights and that the trial court's findings were against the weight of the evidence.  We affirm.

By way of background, in January of 2022, Agency filed a dependency petition alleging, among other things, that Child was not consistently receiving services, including Early Intervention, to address her developmental needs,

and stating that Agency was concerned for Child's "safety and well-being." *See* Trial Ct. Order, 1/11/22, at 1. On January 11, 2022, the trial court adjudicated Child dependent, removed Child from Mother's care, and ordered Agency to ensure that Child receive Early Intervention services. *Id.* at 2.

Over the next twenty-one months, Agency worked with Mother to improve the conditions that led to Child's dependency, providing services such as supervised visitation "with parenting guidance," "visit coaching," "Family Preservation services," referrals for a "neuropsychological evaluation" and other evaluations for Mother, and "extensive communication with [Mother] on concerns for her parenting." *See* Trial Ct. Order, 10/10/23, at 1-2. After a goal change hearing on October 10, 2023, the trial court changed Child's permanency goal to adoption. *Id.* at 2. On October 27, 2023, Agency filed the TPR petition pursuant to 23 Pa.C.S. § 2511(a)(5) and (8) of the Adoption Act, and the trial court held a hearing on the petition on January 30, 2024, during which Mother was represented by counsel, and Richard Henry, Esq., represented Child's interests as Child's guardian *ad litem* (GAL). *See* N.T., 1/30/24, at 7-8. At the TPR hearing, the trial court incorporated the transcript of the October 10, 2023 goal change hearing into the record. *Id.* at 8. Over the course of these two hearings, six Agency employees who had overseen Child's case or supervised Mother's visits with Child testified regarding Mother's ability to parent Child. *See* N.T., 10/10/23, and 1/30/23.

The record from these hearings reflects that Child is autistic and has global developmental delays, and at that time communicated through sign

language and was learning to vocalize words. *See* N.T., 10/10/23, at 145; N.T., 1/30/24, at 9, 23, 26-27. Child was enrolled in a special education program and doing well in school. *See* Trial Ct. Orders, 2/21/23, at 3; 4/18/23, at 3. Each witness who had supervised Mother's visits with Child, including two witnesses called by Mother, testified that they had concerns about Child's safety in Mother's care and did not believe that Child could safely be left unsupervised in Mother care. *See* N.T., 10/10/23, at 60, 77-78, 85, 94-96; N.T., 1/30/24, at 18, 29-30.

Brianna McCombs, a visitation supervisor, testified about an incident in which Mother took Child down to a river's edge, after Mother read a sign that the water was high and life jackets should be worn. Ms. Combs also advised Mother that "the river was being really high and raging," but nonetheless Mother proceeded to take Child down to the river because Child loves water. *See* N.T., 10/10/23, at 51, 68. Mother responded that she never saw the warning sign, but that there was no need for concern because she had been in control of Child the entire time. *Id.* at 126.

Ms. McCombs testified that at another supervised visit, at Mother's second story residence, she observed Child in the living room

> sitting on the couch leaning on the back of it. Basically, hanging outside of an open window that didn't have a screen or any protection on it.
>
> *    *    *
>
> I saw her reach out and as I saw her reach out, I jumped up and I said her name and I went to rush over. As I was rushing over, then [Mother] realized something was wrong or I believe she

> realized something was wrong because she came running behind me saying I got it, I got it, I got it and went and grabbed [Child].

*Id.* at 54-55. Mother responded by promising that she would keep the window closed in the future and, further, nailed a baby gate to the window. *Id.* at 55-56. When Ms. McCombs asked Mother if this solution posed a hazard in the event of a fire by blocking off an exit route, Mother responded that "a firefighter could just kick [] in" the second-story window. *Id.* at 64. Mother testified that on that day she had informed Ms. McCombs "several times my windows are open[,]" and that Child "never got out the window. She wasn't hanging out the window. Nothing to that extent. [Child] was gonna try to shut the window cuz she doesn't like windows like open[.]" *Id.* at 128.

Karen Bates, another visitation supervisor, testified that after she returned from an outing with Child and Mother, she noticed a burning candle in Mother's residence. *Id.* at 91. When Ms. Bates said to Mother that she "forgot to blow out this candle[,]" Mother responded that "that wouldn't matter anyway. . . . I could leave that burning all night and it wouldn't do anything." *Id.* During a different visit at Mother's residence, Ms. Bates observed Child "was in her bedroom pulling all the drawers open on her bureau[,]" and said to Mother "is this anchored to the wall? Because [Child] is getting bigger and stronger and could pull them all out . . . [and] it only takes a few seconds for this to topple over on her." *Id.* Mother responded, "no that would never happen. I wouldn't let that, I could get there quicker enough that it wouldn't happen." *Id.*

While Agency did not dispute that Mother has a bond with Child, the record reflects that Mother does not pick up on Child's cues. **See, e.g.**, N.T., 10/10/23, at 94. The recurring theme from the testimony of the visitation supervisors is that Mother does not give Child an opportunity to express herself, Child does not look to Mother for comfort, and Mother does not recognize Child's need for down time or ensure that Child receives this when prompted. **See id.** at 52, 59-60, 76, 83. With regard to Child's special needs, Ms. McCombs described Mother's conduct at Child's autism evaluation as follows:

> A: [T]he evaluator was asking questions that [Mother] had opportunities to answer as well as anyone who really knew the answer. [T]o my observation [Mother] was not paying attention to what the evaluator was saying. And later on, when we got back to her house, [Mother] let me know that it wasn't important because she already knew what the evaluator was saying and it was basically like the evaluator was writing a prescription for [Child.]
>
> Q: Was that effectively what the evaluation was for?
>
> A: It was to set [Child] up with services but there were some important questions in there for the evaluator to know, where [Child] is in her progress.

**Id.** at 59.

During the autism evaluation, Ms. McCombs noted that Child kept walking away from Mother and went to her foster mother despite Mother's efforts to keep Child with her. **Id.** at 59-60. Brianna Clark, an Agency case worker who also served as a visitation supervisor, testified that Child had not shown any "negative impact" due to the cessation of visits with Mother for a

period of approximately three months since the 'good-bye' visit after the goal change hearing, and that Child "has been doing very well in the [preadoptive] home and her [foster parents] have noticed less tantrums since the last visit [with Mother]."  **See** N.T., 1/30/24, at 19.  Ms. Clark further testified that Child is bonded with her foster family and that the foster family has ensured that Child receives appropriate developmental support services.  ***Id.*** at 20-21, 26.  As a result, Child "has been doing very well [ ] with even names of people in her foster home, objects, and she can communicate what she wants to the family and they understand what she needs and wants."  ***Id.*** at 27.

On March 5, 2024, the trial court issued a decree terminating Mother's parental rights to Child.  Mother timely appealed and both Mother and the trial court complied with Pa.R.A.P. 1925.  On appeal, Mother raises the following issues:

1. Did the trial court commit an abuse of discretion and/or an error of law in involuntarily terminating [] Mother's parental rights to [] Child, pursuant to 23 Pa.C.S. § 2511(a)(5) & (8), when there was insufficient evidence offered to support the same, such that making said finding was against the weight of the evidence presented by the Parties.

2. Did the trial court commit an abuse of discretion and/or an error of law in involuntarily terminating [] Mother's parental rights to [] Child, pursuant to 23. Pa.C.S. § 2311(b), when there was insufficient evidence provided to show that said determination best served the best interests and welfare of [] Child.

Mother's Brief at 4 (some formatting altered).

**Child's Legal Counsel**

Before reaching the merits of Mother's claims we first address whether the trial court appointed legal counsel to represent Child for the termination proceedings pursuant to 23 Pa.C.S. § 2313(a). *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (*K.M.G. II*). Subsection 2313(a) of the Adoption Act directs, in relevant part, that the trial court "shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents." 23 Pa.C.S. § 2313(a). Our Supreme Court has interpreted this statute "as requiring that the common pleas court appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome." *K.M.G. II*, 240 A.3d at 1235 (citation omitted and formatting altered). Further, a child's right to counsel as mandated by Subsection 2313(a) is "not subject to waiver" and failure to appoint such counsel is "structural error." *In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018).

It is well settled that "a single attorney cannot represent a child's best interests and legal interests if those interests conflict." *K.M.G. II*, 240 A.3d at 1236 (citation omitted). In *T.S.*, the trial court appointed a single attorney to represent the "legal and best interests" of two children, then aged two and three, but "no independent counsel represented **solely** the children's legal interests[.]" *T.S.*, 192 A.3d at 1084 (emphasis in original). The children in *T.S.* were described as "pre-verbal" and unable to form "a subjective, articulable preference to be advanced by counsel during the termination proceedings." *Id.* at 1089, 1092. The *T.S.* Court therefore concluded that

"where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests." ***Id.*** at 1092. Further, our Supreme Court explained that

> if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) . . . is satisfied where the court has appointed an attorney-guardian ad litem who represents the child's best interests during such proceedings.

***Id.***

Subsequently, our Supreme Court addressed whether a conflict existed between a court-appointed attorney's dual roles as GAL and as legal counsel for a child who was five to six years old during the proceedings. ***See In re P.G.F.***, 247 A.3d 955, 959, 967 (Pa. 2021). The ***P.G.F.*** Court recognized that "an attorney acting as a child's legal counsel must . . . attempt to ascertain the child's preference and advocate on the child's behalf[,]" but also concluded that "where the child's legal interests cannot be ascertained, [] a court-appointed attorney may serve in the dual capacity of guardian *ad litem* and legal counsel[.]" ***Id.*** at 964, 966.

Here, Attorney Henry appeared as Child's GAL at the termination hearing and at all prior permanency review hearings. ***See*** N.T., 1/30/24, at 7-8; ***see also*** Ex. Agency 2 (dependency court orders). However, because the certified record does not contain the order appointing Attorney Henry, it is not clear whether Attorney Henry was tasked with representing Child's best

interests only or Child's best and legal interests. The trial court met with Child before the October 10, 2023 goal change hearing but did not place on the record any impressions regarding Child's ability to communicate a preference, nor did the trial court expressly address if there was conflict between Child's best interests and legal interests and therefore whether Attorney Henry could serve as both Child's GAL and Child's legal counsel. *See* N.T., 10/10/23, at 4.

Ms. Clark testified that she had worked with Child for fifteen months and that while Child has some speech delays she also "has a lot of words in her vocabulary[]" and had been doing well with names of people in her foster home and names of objects, and "can communicate what she wants to the family and they understand what she needs and wants." *See* N.T., 1/30/24, at 8-9, 26-27. Ms. Clark further testified that "due to [Child's] special needs and her developmental delay," she had "not been able to have a specific conversation about what [Child] wants or what [Child] desires" in the TPR proceedings. *Id.* at 27. The only time Attorney Henry addressed this question on the record was to state at the conclusion of the TPR hearing that Child is "a four-year old child who probably has no idea why we're here, if we're here at all." *Id.* at 38.

Under these circumstances, the record supports the conclusion that Child was unable to express a preference as to the outcome of the TPR proceedings. Accordingly, we conclude that the presumption that no conflict exists between Child's legal and best interests applies and Attorney Henry was

able to represent both interests. *See T.S.*, 192 A.3d at 1092; *see also P.G.F.* 247 A.3d at 964, 966. Therefore, it is not necessary for this Court to remand this matter for the trial court to determine if Child should have been appointed separate legal counsel pursuant to 23 Pa.C.S. § 2313(a).

## Grounds for Termination

Mother argues in her first claim, addressing the grounds for termination under Subsections 2511(a)(5) and (8), that the trial court's conclusion that she failed to sufficiently alleviate the reasons for Child's removal was "not consistent with the evidence presented during the [TPR] hearing." *See* Mother's Brief, at 12-13. Mother contends that her progress in addressing conditions of domestic violence in her household, her participation in parenting classes, and her compliance with a court-ordered neuropsychological evaluation rebuts Agency's position that she is unable to provide a safe environment or appropriate supervision to Child. *See id.* at 13. In Mother's second claim, she contends that the trial court erred in finding that termination served Child's "best interests and welfare" under Subsection 2511(b), on the basis that she shares a bond with Child, claiming that she understands "Child's special needs and developmental delays," and, lastly, noting that she "attended all visits with [] Child[.]" *Id.* at 15-17.

We review decisions to terminate parental rights under the Adoption Act for an abuse of discretion or error of law and may reverse when the trial court has abused its discretion or misapplied the law. *In re K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). The petitioner "must prove by clear and convincing evidence

the existence of" a statutory ground under Subsection 2511(a) and, further, that "termination would best serve the child's needs and welfare pursuant" to Subsection 2511(b). *Id.* at 1105 (citing *In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021); 23 Pa.C.S. § 2511(a), (b)). We need only agree with the trial court as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm a decree terminating parental rights. *See K.T.*, 296 A.3d at 1105.

Subsection 2511(a)(8)

The Adoption Act provides in relevant part

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *     *     *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

Subsection 2511(a)(8) "does not require a [trial] court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children." *See In re M.E.*, 283 A.3d 820, 832 (Pa. Super 2022) (citation omitted). Rather, the relevant query is "whether the conditions that led to removal have been remedied[.]" *Id.* (citation omitted).

Assessing whether a parent has remedied such conditions "specifically 'accounts for the needs of the child[,]'" and recognizes that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress[.]" *Id.* (citation omitted). Further, the needs and welfare analysis required by Subsection 2511(a)(8) "accounts for the needs of the child in addition to the behavior of the parent" and must be addressed separately before considering the best interests of a child. *See In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*).

Here, the trial court explained:

Throughout the dependency, Mother had moderate to substantial compliance with the permanency plan but had periods of minimal progress. For the last review period on October 10, 2023, [the trial court] found there to be minimal progress.

[ . . . ] Mother attended all her visits with [Child] and cooperated with [a parenting skills service provider]. These actions by Mother constitute her moderate and substantial compliance levels with the permanency plan. . . . Mother had taken parenting courses, but [Agency] had not observed the parenting skills during Mother's visits with [Child.] Mother refused to attend a parental fitness evaluation so [Agency] was unable to assess or measure progress in parenting skills beyond what was observed during the visits. Ms. Clark testified that all visits in the last twenty months of placement were supervised due to safety concerns for [Child].

At the time of the hearing, it had been two years since [Child] was adjudicated dependent. The [trial] court found that, given Ms. Clark's testimony and all of the other evidence presented at the hearing, the parenting deficits that led to the removal of [Child] from the care of Mother still existed and were not likely to be remedied within a reasonable period of time. [Child] deserves permanency.

Trial Ct. Op., 4/18/24, at 3-4 (citations omitted and some formatting altered).

As noted previously, the conditions that led to Child's placement included Mother's failure to ensure that Child received consistent Early Intervention services to address her developmental needs and the Agency's concerns that Mother was not able to provide for Child's safety and well-being. *See* Trial Ct. Order, 1/11/22, at 1. All five visitation supervisor witnesses concluded that Child was not safe in Mother's care due to her lack of understanding of Child's particular needs and two of these witnesses described specific instances of Mother's repeated failure to recognize safety issues that if left unaddressed could harm Child. *See* N.T., 10/10/23, at 51, 55-56, 60, 64, 68, 77-78, 85, 91, 94-96, 126, 128; N.T., 1/30/24, at 18, 29-30. The record reflects that Mother is unable to understand Child's needs or recognize safety issues that could harm Child and has failed to meet this Child's particular needs and welfare for more than twelve months. Therefore, we conclude that the trial court did not err or abuse its discretion in finding that Agency established grounds for termination under Subsection 2511(a)(8) by clear and convincing evidence. *See* 23 Pa.C.S. § 2511(a)(8); *K.T.*, 296 A.3d 1085, 1104-05; *M.E.*, 283 A.3d at 832; *see also C.L.G.*, 956 A.2d at 1008-09.

<u>Subsection 2511(b)</u>

Mother also claims that termination does not best serve Child's developmental, physical and emotional needs and welfare, that she is bonded

with Child, and that she understands Child's special needs. *See* Mother's Brief at 15-17.

Section 2511(b) states:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to Subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

"With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination . . . would best serve the developmental, physical, and emotional needs and welfare of the child[]" and the "effect on the child of permanently severing any such bond." *In re Adoption of K.M.G.*, 219 A.3d 662, 674 (Pa. Super. 2019) (*K.M.G. I*) (some formatting altered and citations omitted). Further, the existence of such a bond does not preclude termination. *Id.* at 675. In its Section 2511(b) analysis, the trial court may also, in addition to evaluating whether such a parental bond is meaningful to a child, consider "the safety needs of the child, particularly in cases involving . . . children with special needs." *Id.* (citation omitted).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is not always an easy task.'" *K.T.*, 296 A.3d at 1106 (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)). "[A] court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *Id.* at 1113. Indeed, the *K.T.* Court emphasized that "the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* "[Trial] courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268 (citation omitted). More specifically, courts must consider "the child's need for permanency and length of time in foster care[;] whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *K.T.*, 296 A.3d at 1113 (footnote omitted). In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *T.S.M.*, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When

courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Here, the trial court

> found termination of parental rights to be in the interest of [Child] because it would best serve her developmental, physical, and emotional needs and welfare. [Child] has been safe and provided for while in the care of her Foster Parents, whom [Agency] has identified as an adoptive resource. Further, Ms. Clark testified that [Child] is bonded with her foster family. This court found that [Agency] presented clear and convincing evidence to support the termination of the parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(5) and (8). This court also found that termination is in the best interests of [Child] under 23 Pa.C.S.[] § 2511(b).

Trial Ct. Op. at 4 (citations omitted and some formatting altered).

The record reflects that Child consistently seeks safety, comfort, and support from her foster mother or even with visitation supervisors rather than with Mother. Therefore, we conclude that the trial court's Subsection 2511(b) findings are supported by the record. Further, we discern no error or abuse of discretion by the trial court in concluding that the bond between Mother and Child did not weigh against termination and that termination best served Child's developmental, physical, and emotional needs. ***See K.T.***, 296 A.3d at 1104-05, 1113; ***K.M.G. I***, 219 A.3d at 674; ***T.S.M.***, 71 A.3d at 268. For these reasons, we agree with the trial court's conclusion that Agency presented clear and convincing evidence that the termination of Mother's parental rights would be in Child's best interests. Accordingly, we affirm.

Decree affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date:  1/08/2025